## Ex parte MOORE.

## In re SALE OF ASSETS OF FIRST NAT. BANK OF FLORENCE.

(District Court, E. D. South Carolina. July 17, 1925.)

1. **Banks and banking** ⬤⟹287(3)—**Court has duty to refuse order to sell property of defunct bank, if objections of creditors are well founded.**

The ex parte application of a receiver, appointed under Rev. St. § 5234 (Comp. St. § 9821), by comptroller of currency, for order of sale of assets of defunct bank, is not a judicial controversy, notwithstanding opportunity for objecting creditors to be heard, but it is duty of court to refuse to order sale if objections are well founded.

2. **Banks and banking** ⬤⟹287(3)—**That proposed sale of assets of insolvent bank includes debts not objectionable; "personal property."**

In view of statute authorizing receiver to sell bad and doubtful debts and all real and personal property, a proposed sale of assets of insolvent bank, including debts due it, is not objectionable for failure to distinguish bad or doubtful from good debts, in view of meaning

of "personal property," which includes everything subject of ownership not coming under denomination of real estate, and includes debts and choses in action (citing Words and Phrases, "Personal Property").

3. Banks and banking ⬅⟹287(3)—Provision in proposed sale of assets of insolvent bank for payment of small claims in full held illegal.

In view of Rev. St. § 5236 (Comp. St. § 9823), requiring comptroller to make a ratable dividend of proceeds from insolvent bank's assets, proposed sale of assets of insolvent bank providing for payment in full of certain small claims, amounting in all to approximately $20,-000, held illegal.

4. Banks and banking ⬅⟹287(3) — Proposed sale of assets of insolvent bank, requiring creditors to accept certificates of deposit from purchasing bank, illegal.

A receiver under National Banking Act cannot compel a creditor to accept a new debtor for whole or part of his debt, and proposed sale of assets of insolvent bank requiring creditors to receive certificates of deposit of purchasing bank in lieu of their claims against insolvent bank held illegal as to objecting creditors.

5. Banks and banking ⬅⟹287(3) — Proposed sale of assets of insolvent bank, allowing purchaser to collect and compound certain assets, held illegal.

A proposed sale of assets of insolvent bank, giving purchasing bank power to sell, collect, or compound certain assets, without submitting to court such proposition, and where neither receiver nor comptroller would have any further power, held illegal as amounting to abdication by receiver of duties.

6. Banks and banking ⬅⟹287(3) — Terms of sale prescribed by court must not be illegal.

Although court has full power to prescribe terms of sale of assets of insolvent corporations, it may not prescribe illegal terms which practically nullify provisions of statute, though terms be favored by a very large majority, and would in all probability be for benefit of creditors.

In Bankruptcy. In the matter of the sale of assets of the First National Bank of Florence. Application by S. A. Moore, receiver, for an order of sale. Order refused.

F. L. Willcox, of Florence, S. C., for petitioner.

D. G. Baker and Philip H. Arrowsmith, both of Florence, S. C., and W. C. Miller, of Charleston, S. C., for certain objecting creditors.

ERNEST F. COCHRAN, District Judge. S. A. Moore, as receiver of the First National Bank of Florence, filed a petition under the provisions of section 5234 of the Revised Statutes, as amended May 15, 1916 (39 Stat. 121 [Comp. Stat. § 9821]), for authority to sell certain assets of the insolvent bank.

The substantial facts set forth in the petition are as follows:

The First National Bank of Florence became insolvent, and under the act of Congress the petitioner was appointed receiver. Thereafter a national bank was organized with the name of the First National Bank in Florence, and made an offer to purchase the assets of the insolvent bank. For convenience, the First National Bank of Florence will be hereafter referred to as the insolvent bank, and the First National Bank in Florence as the purchasing bank. The proposed sale has been agreed to by about 98 per cent. in amount of the unsecured creditors and depositors of the bank, and has been approved by the Comptroller of the Currency. A contract embodying the terms and conditions of the sale has been entered into between the receiver and the purchasing bank subject to the approval of the court. The terms are somewhat complicated, and it will not be necessary to set them forth in detail, but they will be stated substantially and only in so far as they are pertinent to the consideration of the objections that have been made to the proposed sale. The plan provides for the division of the assets into two classes, one class termed the acceptable assets, which amount to $629,284.20, and the remainder, which are termed the unacceptable assets, and which amount to the sum of $476,743.45. The contract provides that the acceptable assets are to be purchased outright and become the absolute property of the purchasing bank. The unacceptable assets, however, are to be acquired and held in trust by the purchasing bank for the benefit of unsecured creditors on certain terms and conditions.

As a consideration for the sale of these assets, the purchasing bank agrees to certain things which, eliminating details, are as follows:

(1) The purchasing bank is to pay to the secured and preferred creditors of the insolvent bank 100 per cent. of such claims, with interest, thereby redeeming for the unsecured creditors all excess of value in the collateral pledged on such secured debts.

(2) The purchasing bank is to pay to each unsecured creditor and depositor of the insolvent bank 60 per cent. of such unsecured claims except as to those depositors or creditors for whom a different settlement is provided. This 60 per cent. payment is to be in the form of four certificates of deposit of the purchasing bank payable in installments at certain specified times.

(3) The purchasing bank is to allow all parties indebted to the insolvent bank offsets in all cases in which the parties are entitled thereto against the insolvent bank.

(4) The purchasing bank is to pay at specified times all of the following depositors in full, to wit: (a) Each depositor whose balance is $25 or less; (b) all Christmas savings accounts; (c) all vacation club accounts. The record does not show the amount of these small accounts, but it was stated at the hearing that they amount in round numbers to something over $20,000.

(5) The purchasing bank is to take over the banking house and equipment at an agreed price of $54,000, cash on hand, and acceptable assets that bear no interest at their face value, and such interest-bearing bills receivable as are acceptable, at their face value, plus interest to date of sale, or, if interest is paid to a date beyond the sale date, at a discount on the interest from the date of sale to the maturity of the bills receivable.

(6) The purchasing bank is to issue to the unsecured creditors certain certificates which will entitle them to participate in the proceeds of the collections of the unacceptable assets.

(7) The purchasing bank is to take over and hold all of the unacceptable assets, make collections thereof, and hold the collections in trust as a trust fund for the benefit of the unsecured creditors who hold the participating certificates hereinbefore mentioned. In making these collections the purchasing bank is to act in conjunction with three trustees nominated by a depositors' committee and one trustee nominated by a stockholders' committee of the insolvent bank. Provision is made for the removal of such trustees and filling of vacancies. The purchasing bank is to have full authority to sell, collect, or compound such unacceptable assets without submitting to the court such propositions for sale or compounding thereof as may be made from time to time. The trustees are to act without compensation, but all legal expenses, accounting expenses, and other necessary expenses to properly liquidate the unacceptable assets, including 3 per cent. of all amounts collected which the purchasing bank is to receive as compensation for its services, are to be a proper charge against the proceeds of such unacceptable assets, to be paid before dividends are distributed to those holding the participating certificates. But such charges and expenses are to be fair and reasonable, and, in case of disagreement, may be submitted to this court at the instance of any party in interest for decision as to such fairness and reasonableness. Provision is also made, in case there should be a surplus left over from such liquidation of the unacceptable assets after the payment of the unsecured creditors in full with legal interest, for such surplus to be paid over to the stockholders.

(8) The contract makes further provision that the trustees representing the depositors in the liquidation of the unacceptable assets, at the expiration of two years from the date of the confirmation of the sale, are to furnish certain data to the Comptroller of the Currency for the purpose of levy of an assessment against the stockholders, if such assessment be necessary, and provides that nothing in the agreement shall be construed to release the stockholders from the payment of any stock assessment.

Upon the filing of the petition the court fixed a date for a hearing, and ordered notice given by publication to all parties interested to appear and present any objections they might have to the proposed sale. Certain creditors appeared and filed their objections in writing. Among them was one unsecured depositor whose deposit amounted to $12,500. One depositor appeared by attorney and objected orally. The court received the objections, and heard arguments thereupon.

In Cook County Nat. Bank v. U. S., the Supreme Court held that the act authorizing the formation of national banks constituted by itself a complete system both for establishment as well as government of such banks, including their liability to be put in the hands of a receiver, "and the manner, in such event, in which their affairs shall be wound up, their circulating notes redeemed, and other debts paid or their property applied towards such payment." The court continued: "Everything essential to the formation of the banks * * * the winding up of the institutions and the distribution of their effects, are fully provided for, as in a separate code by itself, neither "limited nor enlarged by other statutory provisions with respect to the settlement of demands against insolvents or their estates." Cook County Nat. Bank v. U. S., 107 U. S. 448, 450, 2 S. Ct. 564, 27 L. Ed. 537.

[1] Section 5234 of the Revised Statutes (Comp. Stats. 1918, § 9821), provides that the Comptroller of the Currency may appoint a receiver and require of him such bond and security as he deems proper. The

duty of the receiver is, under the direction of the Comptroller, to take possession of the books and assets of every description of the bank, collect all debts due and claims belonging to it," and upon the order of a court of record of competent jurisdiction, may sell or compound all bad or doubtful debts, and on a like order, may sell all the real and personal property of such association, on such terms as the court shall direct; and may, if necessary to pay the debts of such association, enforce the individual liability of the stockholders. Such receiver shall pay over all money so made to the Treasurer of the United States, subject to the order of the Comptroller, and also make report to the Comptroller of all his acts and proceedings."

The application to this court for an order for the sale of assets is a step in the winding up of the affairs of the bank, and, if such order be granted, although made by a court of record of competent jurisdiction, still the funds collected from the sale are not subject to a disbursement by the court, but by the Comptroller, by whom the receiver was appointed and controlled. In re Chetwood, 165 U. S. 443, 17 S. Ct. 385, 41 L. Ed. 782. The receiver is not an officer of the court (In re Chetwood, supra), nor does the receiver by this application submit himself and the affairs of the bank to the jurisdiction of the court; nor does the presentation of the application operate to make the receiver an officer of the court, or place the assets of the bank under the control of the court "in the sense in which control is required where a receiver is appointed by the court." In re Chetwood, supra.

This proceeding is an ex parte proceeding, and, though by the will of Congress put under judicial cognizance, is not by its own nature a judicial controversy. The fact that the court sought information and directed notice to be published that the court would hear persons interested upon any objections they might make does not change the character of the proceeding. That course was followed out of a cautious wish to gain advice that would be helpful in finally determining whether or not the order applied for by the receiver should be granted. Ex parte Cockcroft, 104 U. S. 578, 26 L. Ed. 856. The statute does not intend that an objecting creditor can litigate with the receiver (who represents creditors and the insolvent bank) the question determined by him as to the advisability of disposing of the assets of the insolvent institution. There is no suit,

no process is issued, and there are no parties in the legal understanding of the term. The objecting creditors therefore have no legal standing to be heard as a matter of right. Nevertheless, the court has heard them for its own information, and, if their objections, are well founded, or if the court of its own motion should deem that there are objections to the sale, it would be the duty of the court to refuse to order the sale to be made.

[2] The first objection is that the proposed sale is a sale of all of the assets which would include debts due the insolvent bank, and it is claimed that under the statute the court is powerless to authorize a sale of debts, unless it is first ascertained that such debts are bad or doubtful. In support of this contention the objecting creditors cite In re Earle (C. C.) 92 F. 22. But that case does not sustain this point. That case was an application by a receiver to sell at private sale certain certificates of stock which were held by the bank as pledgee and not as owner, and the court held that the order applied for was not for the sale or compounding of the debt, and that the property which it was contemplated to sell was not the property of the association. It is true that the court stated that it was only when debts are bad or doubtful and it is deemed expedient to sell or compound them that the court can be called upon to make any order respecting them, but this was a mere dictum, and not necessary to the decision of the case. Moreover, the court said in the opinion that the views of the court were very hastily expressed. While viewing this dictum with great respect, I do not see my way clear to follow it. It is true, that the statute does provide that upon the order of the court the receiver "may sell or compound all bad or doubtful debts," and, if the statute had stopped there, only bad or doubtful debts could be ordered sold. But the statute goes further and provides that the receiver "on a like order may sell all the real and personal property of such association on such terms as the court shall direct." I do not think the words "personal property" in this connection should be restricted to chattels so as not to include debts or choses in action. In its broad and general sense personal property includes everything which is the subject of ownership not coming under the denomination of real estate, and includes debts and choses in action. 32 Cyc. 667, 669; 6 Words and Phrases, p. 5346. While the words "personal property" are sometimes used in a more restricted sense, never-

theless in this statute I think they were used with the broader meaning generally attached to the phrase; nor do I think that the specific authority in the first part of the statute to sell doubtful debts excludes the idea that Congress by use of the words "personal property" intended to include debts. The case is one that frequently occurs in statutes where specific authority is first given, and later the act provides for a broader authority, including the specific authority previously mentioned. Many cases may arise where it is advisable to sell good debts along with bad debts, and I am not disposed to construe this statute so strictly as to prevent the receiver from making a sale of assets either as a whole or such good debts as may be advisable for good and sufficient reasons to sell instead of collecting. I therefore decline to sustain this objection.

[3] The next objection made to the proposed sale is that the provision for the payment of certain small claims in full is illegal. Section 5236 of the Revised Statutes (section 9823, Comp. Stats. 1918) provides that from the moneys collected after redeeming the notes of the association "the Comptroller shall make a ratable dividend * * * on all such claims as may have been proven," etc. The Supreme Court has held that under this section no preference is given for any claim except for moneys to reimburse the United States for advances in redeeming circulating notes, and that the unsecured creditors share ratably. Cook County Nat. Bank v. U. S., 107 U. S. 445, 450, 2 S. Ct. 561, 27 L. Ed. 537.

The effect of the provision in this contract for the payment of all depositors whose accounts are less than $25, and certain other small accounts in full, is that a part of the consideration of the sale of the assets which should be applied ratably to all creditors is given to certain creditors absolutely, and the remaining creditors have no share in such part of such consideration. I do not think this can be legally done. It is urged upon the court that these small creditors are to be paid in full simply as a matter of convenience in order to save clerical work of issuing so many certificates of deposit for them, and that the expense would offset any saving made by paying them ratably. This may be true, but the court is not authorized under the guise of a sale of property to change the status of creditors from what the law provides. It is also urged very strenuously that the difference, if any, so far as the claims of objecting creditors are con-

cerned, would be so small that they should be disregarded on the principle of de minimis non curat lex. It was stated orally at the hearing that the amount of these small deposits was something in excess of $20,000. It appears from the objections filed by the creditors that more than one-half of the depositors (in number) belong to the small class whose deposits are less than $25. While the effect of paying them in full may not greatly decrease the amount that would be coming to the objecting creditors, nevertheless I do not think it is a case for the application of the maxim de minimis non curat lex. Those creditors who have assented to the proposed plan would no doubt be estopped, but the objecting creditors' rights must be preserved by the court, even though the amount that they would receive would be decreased very little. This objection to the proposed sale must therefore be sustained.

[4] The next objection is in substance that the objecting creditors are required by the plan of the proposed sale to receive certificates of deposit of the purchasing bank in lieu of their claim against the insolvent bank. There is nothing in the National Banking Act (13 Stat. 99) that has been called to the attention of the court which would allow the receiver or this court to compel a creditor to accept a new debtor for the whole or a part of his debt, and that is what this proposed plan amounts to. It is true that the court has power to direct the terms of the sale, and, if the certificates of deposit were to be issued to the receiver and held by him until collected, and then paid in full and disbursed to the depositors, as required by the statute, I think this vice in the proposed plan would be eliminated. I think also that it would be proper for the receiver in a proper case to sell the assets and take such certificates of deposit in payment and turn the same over to such of the depositors who might consent to take such new certificates, and hold the remainder and collect them for the benefit of those depositors who do not care to accept such certificates. The proposed plan of sale might be changed to obviate this difficulty in the present plan, and the court is not prepared to say that it would not approve one of the suggested alternative plans. But, as the plan now stands, the court cannot approve it over the objection of a creditor who is unwilling to accept a new debtor in lieu of his claim against the insolvent bank, and therefore this ground of objection must be sustained.

[5] The next objection is that under the

proposed plan for the sale of the assets the unacceptable assets are to be collected, not by the receiver under the direction of the Comptroller, as the law requires, but are to be turned over to the purchasing bank for collection in conjunction with certain trustees. The proposed plan virtually amounts, so far as the unacceptable assets are concerned, to an abdication by the receiver of the duties imposed upon him by law. There is no authority of law for him to turn over these unacceptable assets to other persons for collection without retaining any control over their actions. It is to be observed also that under the proposed plan the purchasing bank is to have the power as to the unacceptable assets "to sell, collect or compound such unacceptable assets without submitting to the court such proposition for the sale or compounding thereof as may be made to it from time to time." The receiver may not sell or compound without obtaining an order of the court, and yet it is proposed to allow the purchasing bank these wide powers. I think this is in direct conflict with the statute, and cannot be approved. No doubt the receiver may employ agents to collect assets, and this illegality in the proposed plan might be obviated by the purchasing bank and the representatives of the creditors and stockholders collecting the assets as the agents of the receiver and subject to his control and all under the control of the Comptroller, and, if such were the case, the plan would not be disapproved. But that is not the case here. Here neither the receiver nor the comptroller will have any further power over the unacceptable assets under this plan, and the receiver abdicates practically all of his duties and functions except his duties in reference to the stockholders' assessment. This objection to the proposed plan must likewise be sustained.

[6] It has been argued very earnestly that the court has full power to prescribe the "terms" of the sale, and that all of these matters are a part of the terms which are within the power and discretion of the court. But the terms of sale to be prescribed by the court must not be illegal, and must not practically nullify other provisions of the statute. The court undoubtedly would have the power to prescribe that the receiver might sell on time and take evidences of the debt in the form of certificates of deposit, but I cannot think that it was the intention of Congress that the court should, under the guise of prescribing terms of sale, provide such a plan of reorganization as would be in conflict with positive provisions of law and would deprive the creditors of substantial rights to which they are entitled under the statute. I think the proposed plan does this in the particulars mentioned.

It has been very earnestly argued that, 98 per cent. in amount having accepted, and the plan having been approved by the Comptroller, a small minority should not defeat a plan which is claimed to be undoubtedly for the benefit of all, and that, unless this plan is adopted, not only the large majority of the creditors, but the small protesting minority, will receive a great deal less in the end. The court is not unmindful of the weight of this argument; nor is the court unmindful of the fact that under modern conditions in the case of large corporations with great interests it is as a practical matter impossible in many cases to provide simply for a sale or collection of the assets, and that some plan of reorganization is in most cases absolutely necessary. It is also true that assets of this nature can be collected much better by a going concern than by a receiver. But the answer to all of this is that Congress has not provided for such a situation, nor given the court the authority to order such reorganization in the case of national banks. The court is limited to ordering a sale on proper terms, and those terms cannot be made to embrace matters which are illegal, or which violate vested rights, even though the objecting parties are in the minority.

The court is impressed with the fact that the proposed reorganization in all probability is the very best that could be devised, and would be conducive in the long run to the interests of all the parties and the community in which the insolvent bank is located. But the court is compelled to act according to the law as the court finds it.

For these reasons, the application of the receiver for an order to sell the assets referred to as set forth in the petition is hereby refused without prejudice, however, to a renewal of the application for a sale upon such terms as are free from the objections herein sustained and are in accord with law.