## In re NORTH CONTINENT UTILITIES CORPORATION.

### No. 355.

District Court, D. Delaware.

Feb. 29, 1944.

---

528

David K. Kadane, of Philadelphia, Pa., for Securities and Exchange Commission.

Sidney K. Schiff (of Pam, Hurd & Reichmann), of Chicago, Ill., for North Continent Utilities Corporation.

Helmer Hansen, of Chicago, Ill., for Preferred Stockholders' Committee.

LEAHY, District Judge.

This matter is here on an application of the Securities and Exchange Commission pursuant to Section 11(e) of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79k(e), to approve a certain plan of North Continent Utilities Corporation as fair, equitable and appropriate to effectuate the provisions of Section 11(b) of the Act. At the hearing both the corporation and the Commission supported the plan. A preferred stockholders' committee opposed court approval on the ground that the plan was not a "plan" within the meaning of Section 11(e) of the Act; that the Commission has made no attempt to comply with Section 11(b) (2) in that it has allowed the voting power of the corporation to be unfairly and inequitably distributed; and that the proposed method of the pro rata distribution of the proceeds from the sale of assets is unfair to the preferred stockholders. The court, after hearing and an examination of the facts and the law, makes the following

## Findings of Fact.

1. North Continent Utilities Corporation (herein referred to as "the corporation") is a Delaware corporation and is a holding company under Section 2(a) (7) of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79b(a) (7). It has filed a notification of registration under Section 5(a) of the Act, 15 U.S.C.A. § 79e(a).

2. The subsidiaries of the corporation consist of utility and nonutility companies engaged in the electric, gas (manufactured and natural), water, ice, cold storage, coal, coke, oil, feed and telephone businesses. Its operations are scattered, i. e., it conducts its affairs in Arizona, Colorado, Illinois, Kansas, Minnesota, Montana, New Mexico, and in the Provinces of Ontario and Alberta, Canada.

3. The corporation has outstanding $3,417,500 principal amount of first lien collateral and refunding 5½% bonds due January 1, 1948; 43,821 shares of $7 preferred noncumulative convertible stock, each share entitled to one vote and entitled in liquidation to a preference of $100 per share; and 166,752 shares of no-par common stock, the stated value of which is $166,964.50, each share entitled to one vote.

4. On November 16, 1943, the Commission entered an order under Section 11 (b) (2) of the Act requiring the liquidation and dissolution of the corporation.

5. All of the issued and outstanding shares of capital stock of the corporation's subsidiaries owned by it (with the exception of the shares of Southern Arizona Public Service Company, 1,221 shares of North Continent Mines, Inc., and 1,221 shares of The S. W. Shattuck Chemical Company) and certain indebtedness owed to the corporation by several of its subsidiaries, are pledged as collateral security for its first lien collateral and refunding 5½% bonds.

6. On April 19, 1943, the corporation filed its application pursuant to Section 11 (e) for the approval of a plan. The plan has been from time to time amended. In its present form, dated as of August 2, 1943, it provides for the sale of the portfolio securities of the corporation and the distribution of the proceeds pro' rata to the bondholders up to the principal amount of the bonds, and after the satisfaction of the bonds to the preferred stockholders. In the event that any assets remain after the satisfaction of the claims of the preferred stockholders, then common stockholders will participate. A provision is contained in the plan for distribution of portfolio assets in kind to bondholders and stockholders.

7. On November 16, 1943, the Commission approved the plan but reserved jurisdiction in regard to any distribution of portfolio assets in kind, and over the relative treatment of the preferred stockholders vis-a-vis the common stockholders.

8. After the corporation so requested, the Commission has applied to this court under Section 11(e) for enforcement of the plan.

9. The only pertinent provisions of the plan which call for judicial examination are: (a) The requirement that bondholders send their securities to the indenture trustee for registration, to be stamped with an appropriate legend and the detachment of interest coupons; (b) the requirement that cash proceeds of sales of portfolio securities of the corporation be sent to the trustee and distributed among the bondholders in multiples of 1% of the original principal amount thereof; (c) the provision that interest shall cease to accrue on the portion of the bonds so prepaid; and (d) the provision that the bonds shall be considered fully paid and the corporation's obligation discharged when the bondholders shall have received, exclusive of interest, the full principal amount of the bonds without payment of any premium.

10. The undisputed evidence before the Commission and introduced into the record before this court shows that the market for the bonds is what is known as a "thin market", so if the plan provided for market purchases of bonds (as urged by the preferred stockholders' committee) rather than pro rata distributions, and if any considerable amount of cash were available to make such purchases at market, it is extremely doubtful that the corporation would be able to acquire any substantial amount of bonds at prices below par. Thus, it appears that payment of the bonds as provided for in the plan will give the bondholders the fair equivalent of the rights represented by their bonds.

## Discussion

■ I. The argument is rejected that we do not have "a plan" before us within the meaning of Section 11(e). While the plan

may be "boiler-plate" in form, the problem of compliance with the Act by the corporation in the instant case is simple. The Commission having determined that liquidation is required is of itself sufficient to constitute the "plan" a plan under the Act, and a more elaborate ritual for the cremation cannot rationally be justified.

II. The common stock is without present value and every prognosis indicates it never will have value. The complaint of the preferred is that under these circumstances there is an unfair and inequitable distribution of voting power which the Commission should remedy under Section 11(b) (2) of the Act. In short, the argument is that the common stockholders' management should be deposed and the bondholders and preferred should control either a reorganized company or the liquidation because when the bondholders have been satisfied the preferred stockholders will be the sole remaining owners of the equity.

■ Once a plan has been filed with the Commission it need not be rejected or disapproved because it fails to provide for a redistribution of voting power among the security holders prior to a liquidation and dissolution. Under the particular facts of this case, it is difficult to see why fairness and equity to the preferred stockholders requires a redistribution of voting power. At the trial I put the question to the preferred stockholders: was it believed that the preferred stockholders' management could obtain higher prices or make better bargains in regard to the sale of the corporation's assets? The preferred frankly admitted they made no such contention. In fact, there was no evidence which indicated that a new management or a court appointed trustee could perform a better job of liquidation than that being done by the present management under the supervision of the Commission. Hence, I conclude the Commission was justified in not pausing to work into the plan a provision for redistribution of voting power between the preferred and common stockholders. Such would probably call for a reorganization instead of a liquidation with resultant unnecessary expense and delay. Under Section 11(e) the Commission is under no statutory duty to find that the plan is the only plan which is necessary to effectuate the provisions of Section 11(b) and the only plan which is fair and equitable to creditors and stockholders. It does its duty when it finds a plan which is reasonable and appropriate to effectuate compliance with Section 11(b) and is fair and equitable to all security holders.

■ III. No party has raised any objection to the terms of the plan providing that the bonds may be satisfied prior to maturity without payment of a premium, but I shall nevertheless pause briefly to consider the matter. Under the terms of the indenture, the bonds may be redeemed prior to maturity "at the option of the Company" at a premium. The premium at the present time is 2½ per cent and decreases ½ of 1 per cent each successive July 1. However, there is no provision in the indenture for payment of a premium in the event of involuntary liquidation.

The bondholders, here, do not have an absolute claim to the payment of the premium, but, at most, a contingent claim if the bonds are redeemed prior to maturity "at the option of the Company". Such option gives the company the right or discretion to mature its bonds at a date earlier than that otherwise provided. The language of the indenture plainly indicates that the parties did not contemplate that the redemption provision should be effective upon action taken by the corporation in an effort to comply with the mandate of Congress embodied in the Public Utility Holding Company Act of 1935. In re United Light & Power Co., D.C.Del., 51 F.Supp. 217, I held valid a plan which gave something to common although there was not sufficient to pay the liquidating preferences on the preferred. Since the charter provided that the preferred was to be entitled to the stated preferences whether the dissolution or liquidation was voluntary or involuntary, that opinion is a fortiori authority for the action of the Commission in the present matter in finding under all the circumstances, "including the earning coverage of the bonds, the financial condition of the company, the prospects of advantageous sales of its portfolio securities, and the benefits accruing to all security holders from liquidation rather than reorganization" that the payment of the bonds in the amounts provided in the plan, and without the premium, is fair and equitable. It may be under a different fact situation the Commission might determine that a premium should be included in such payment. See City National Bank & Trust Co. of Chicago v.

Securities and Exchange Commission and North American Light & Power Company, 7 Cir., 134 F.2d 65; New York Trust Co. et al. v. Securities and Exchange Commission, 2 Cir., 131 F.2d 274. These and allied questions as to the quantum of participation by bondholders in the future in cases where the public utility holding company is insolvent or is approaching insolvency will raise nice questions for court decision.[1]

I conclude by making the following formal

### Conclusions of Law

1. The corporation is a registered holding company under Section 5 of the Act.

2. This court has jurisdiction of the corporation under Section 25, 15 U.S.C.A. § 79y.

3. The plan of liquidation and dissolution, or more precisely that portion of the plan now before the court, is found to be appropriate to effectuate the provisions of Section 11.

4. The plan is not unfair or inequitable because some undetermined number of bondholders may be willing to sell their bonds in a "thin" market to the corporation at amounts less than par.

5. The plan, subject to the reservations contained in the Commission's order of November 16, 1943, is found to be fair and equitable.

A form of order should be submitted granting the present application to enforce and carry out the plan, including a provision that the jurisdiction of the corporation and its assets wherever located is taken by this court in order to enforce and carry out the provisions of the plan.

---

[1] These problems will, of course, be different from the problem of whether a bondholder in the usual situation is entitled as a matter of right to the benefit of the absolute priority rule because he is a creditor. Professor E. Merrick Dodd in "Holding Company Act Recapitalizations", 57 Harvard Law Review 295, takes the position that the use by Congress in Section 11 of the Holding Company Act of the same words of art which it had previously used in Sections 77 and 77B of the Bankruptcy Act, 11 U.S.C.A. §§ 205, 207, incorporated the fixed principle of absolute priority into the Holding Company Act. Dodd is of opinion that the Securities and Exchange Commission in administering Section 11 is indubitably bound by the absolute priority rule where insolvency is present and that the words "fair and equitable" mean the same in Section 11 as they do in the Bankruptcy Act.

The contra view will undoubtedly take the following form: The powers which Congress conferred on the Securities and Exchange Commission were novel and revolutionary. That "fair and equitable" had received a fixed meaning through judicial interpretation in dissimilar situations is no argument that Congress intended to adopt that interpretation and construction in the Holding Company Act; and that Congress intended to give the Commission wide latitude so that it might act in accordance with the dictates of its expert judgment. In most instances, the argument will advance, the Commission would doubtless accept the absolute priority rule as satisfying colloquial fairness and equity, but the fair and equitable standard as used in the Act does not impel that inexorable result in all cases. Securities and Exchange Commission v. Chenery, 318 U.S. 80, 63 S. Ct. 454, 87 L.Ed. 626, will be said to furnish some support for this conclusion for if the Commission in its determination of what is fair and equitable relative to the matter before it in the Chenery case is not bound by settled judicial precedents, there is no reason why it must be bound to accept the absolute priority rule as the only applicable rule. The financial community which represents the investor viewpoint interpreted the In re United Light & Power Co., D.C.Del., 51 F.Supp. 217, doctrine to apply to all proceedings under the Public Utility Holding Company Act of 1935 and went so far as to suggest that the rule there applied should be extended to railroad reorganizations. See, for example, editorial comment in Wall Street Journal, Vol. 112, p. 5, July 31, 1943. And there is a congressional movement to ameliorate the inflexible strictures of the absolute priorities rule as applied to reorganizations under the Bankruptcy Act. See H.R. 2857, 78th Cong., 1st Session.

It is too early to say which of these two possible views will finally emerge.