## In re STANDARD GAS & ELECTRIC CO.

Civ. No. 489.

District Court, D. Delaware.

March 2, 1945.

As Amended March 29, 1945.

David K. Kadane, of Philadelphia, Pa., for Securities and Exchange Commission.

C. A. Southerland (of Southerland, Berl & Potter), of Wilmington, Del., Robert H. Richards, Sr. (of Richards, Layton & Finger), of Wilmington, Del., A. Louis Flynn, of Chicago, Ill., and B. A. Javits, of New York City, for Standard Gas & Electric Co.

Thomas O'G. FitzGibbon (of Davis, Polk, Wardwell, Sunderland & Kiendl) and Paul P. Eagleton, both of New York City, for Guaranty Trust Co.

Murray Taylor (of Seibert & Riggs), of New York City, for Standard Power & Light Corporation.

Sidney K. Schiff (of Pam, Hurd & Reichmann), of Chicago, Ill., for A. O. Stewart and others.

Albert J. Fleischmann, of Baltimore, Md., pro se.

Claude Pearce, of Toronto, Canada, pro se.

James R. Morford (of Marvel & Morford), of Wilmington, Del., and Spencer Pinkham (of Holthusen & Pinkham), of New York City, for Frank Bailey, Marie Louise Bailey, Union College and Equitable Holding Corporation.

W. Kent Cochran, of Boston, Mass., pro se.

LEAHY, District Judge.

This is an application of the Securities and Exchange Commission pursuant to Sections 11(e) and 18(f) of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. §§ 79k(e), 79r(f), "to enforce and carry out the terms and provisions of" a compliance plan of Standard Gas and Electric Company [1] (a Delaware corporation) filed for the purpose of enabling Standard to submit to the provisions of Section 11(b) of the Act, 15 U.S.C.A. § 79k(b). A discussion of the details of the amended plan of this solvent [2] public utility holding company may be found elsewhere and need not be discussed here.[3]

The substance of the plan is apparent by the various objections to it; (1) one $6 Prior Preference stockholder contends that, as against the $7 Prior Preference stock, some substantial recognition should be given to the liquidation preferences of the $6 Prior Preference stock, and lesser recognition to its claim on earnings, despite inconvenient fractions resulting therefrom; (2) then there are objections to the treatment accorded $4 preferred stockholders and common stockholders because the plan allocates approximately 5% of the new common stock to the $4 (junior) preferred stockholders, and totally excludes the old common stock; and (3) certain holders of notes and debentures of Standard object to the provisions of the plan which, it is argued, force them to accept and receive, in lieu of their notes or the face value thereof in cash, common stocks (hereinafter collectively referred to as the "Stocks") of other utility and underlying corporations. The notes and debentures of Standard aggregate $59,000,000, are in six series having variable dates of maturity from May 1, 1948 to December 1, 1966, are treated on a parity in the plan as originally filed and are so treated in the plan as amended. Their provisions vary, however, as to the payment of interest without deduction for federal taxes, refunds to the holders of state taxes paid by the holders, convertibility into other securities, and restrictions against the issuance of additional funded debt. They are issued under seven trust agreements or supplemental trust agreements.[4] The plan provides that, instead of cash, the Noteholders will receive part cash and part Stocks. Each of the Stocks has been appraised by experts. Delivery and exchange are

---

[1] For convenience Standard Gas and Electric Company is referred to as "Standard"; Securities and Exchange Commission as the "Commission"; and the Public Utility Holding Company Act of 1935 as the "Act".

[2] Standard is solvent, both in the equity and in the bankruptcy sense. The assets of Standard have a fair value of not less than $104,000,000 and not more than $126,400.000; however, such assets are carried on the books of Standard at $178,927,518. Its debts, comprised entirely of notes, aggregate approximately $59,-

000,000. The notes are covered by assets of Standard to the extent of about two to one. The fixed 6% cumulative interest rate on the notes has generally been earned by a comfortable margin.

[3] The details of the plan are fully set forth in the findings and opinion of the Commission approving the plan dated November 15, 1944. See Holding Company Act Releases Nos. 5430 and 5070.

[4] The notes and debentures are hereinafter referred to as the "Notes" and the holders thereof as the "Noteholders".

to be on the basis of such appraised values. In addition, the plan provides for the payment or deduction of a so-called differential, not to exceed 3 per cent, in the event that the market in public utility securities should increase or decline between August 15, 1944 and the date when the plan should be approved by the Commission. The differential has now been fixed by the Commission at $5.05. Accordingly, the plan, as it is presently presented here for enforcement, provides for the cancellation of the Notes and the payment of each $1,000 principal amount thereof as follows:

of the Chandler Act[6] which permit conversion of debt into securities upon the assent of a requisite number of creditors, were regarded as a radical innovation, and the absence in Sec. 11 of the Public Utility Holding Company Act of language comparable to that appearing in Sec. 77B, for example, demonstrates the general rule of law requiring payment in cash to creditors should prevail. In support of their position they point out that no language[7] appears in either Sec. 11(b) (1) of the Act, requiring disposition of non-retainable interests in other companies, or in Sec. 11(b) (2) requiring simplification of corporate struc-

Cash payment .............. $ 304.95
Cash differential ............ 5.05

| Stocks | No. of Shares | Assigned Value per Share | Aggregate Assigned Value |
|---|---|---|---|
| Pacific Gas and Electric Co. | 3 | $32 | $ 96 |
| Oklahoma Gas and Electric Co. | 12 | 21 | 252 |
| The California Oregon Power Co. | 5 | 24 | 120 |
| Mountain States Power Co. | 2 | 21 | 42 |
| Wisconsin Public Service Corp. | 18 | 10 | 180 |

690.00

Total .................... $1,000.00

A proposal to alter rights of creditors, by requiring them to accept in payment of their debt securities instead of cash, raises two questions: (a) does the Act authorize such alteration or modification, and if yes (b) is the proposed action fair and equitable?

1. The case at bar presents the first instance in which the Commission has approved satisfaction of indebtedness of a solvent public utility holding company by payment in other securities rather than in cash.

The Noteholders insist a creditor cannot be made to accept securities in a reorganized company without his consent and every plan must provide for payment in cash to non-assenting creditors. They contend the provisions of the Railroad Reorganization Act,[5] of Sec. 77B, 77, subs. b, d–f, of the Bankruptcy Act and its successor, Chap. X

ture, which authorizes or commands conversion of debt into securities to achieve the purposes of those two sections.

Absent statutory authorization, a creditor has the right to demand cash for payment of his debt in reorganization. Geddes v. Anaconda Mining Co., 254 U.S. 590, 41 S.Ct. 209, 65 L.Ed. 425; Coriell v. Morris White, Inc., 2 Cir., 54 F.2d 255; In re Northampton Portland Cement Co., D.C., 185 F. 542; In re Sale of Assets of First Nat. Bank of Florence, D.C., 6 F.2d 905; In re J. B. & J. M. Cornell Co., D.C., 186 F. 859, 201 F. 381; In re Prudential Outfitting Co., D.C., 250 F. 504. See Gerdes on Corporate Reorganizations, Sec. 1038. Under Section 77 of the Railroad Reorganization Act, specific provision is made calling for the approval of the reorganization plan by each class of security holders affected, unless the Inter-

---

[5] 11 U.S.C.A. § 205(b), (d), (e) and (f).

[6] 11 U.S.C.A. § 207 and 11 U.S.C.A. § 616.

[7] Such as appears in the statutes noted, viz., creditors' rights may be altered or modified "either through the issuance of new securities of any character or otherwise."

state Commerce Commission and the enforcement court find that any particular securities are without value. Likewise under Sec. 77B of the Bankruptcy Act and Chapter X, 11 U.S.C.A. § 501 et seq., provision is made for participation of creditors in the acceptance of a plan which changes their debt status to that of a stockholder or other type of security holder. Such statutory authorization is found in state statutes. See Sec. 5(9) of the Delaware Corporation Law, Rev.Code of 1935, c. 65, p. 462, § 2037(9). But, under the Public Utility Holding Company Act there are no such provisions. We are not convinced from an examination of legislative history that Congress intended the Commission to have power to require creditors of solvent companies to accept portfolio equity securities in payment of debt. In enacting analogous legislation Congress has obviously and with particularity expressed its intention that administrative bodies and courts may modify creditors' rights if certain statutory procedures are followed. A holding that the creditor here is entitled to cash if his debt is to be paid is not in conflict with the doctrine announced in Otis & Co. v. Securities and Exchange Commission, 65 S.Ct. 483, for the relation of a creditor to a solvent company is quite different from the relation that exists between the stockholders inter sese.

In a case of preferred stock vs. common stock, such as was involved in Otis & Co. v. Securities and Exchange Commission, preferred does not necessarily receive its contractual liquidating rights because where simplification by nominal (but not actual) liquidation is compelled under the Act, charter provisions do not apply. That being so, claims of preferred are not matured and are consequently not a debt.[8] In the case of bondholders, it is elementary, a debtor-creditor relationship exists from the time the bond is issued. The claim of a bondholder may not always be matured in the sense that he can demand

payment, but his is always a matured obligation in the sense that a debt exists eo instanti and from the time of its contractual conception.

2. In Otis & Co. v. Securities and Exchange Commission, 65 S.Ct. 483, the Supreme Court held the Holding Company Act, in providing that plans for simplification be "fair and equitable", incorporates the principle of full priority in the treatment to be accorded various classes of security interests, a view long recognized in bankruptcy and reorganization statutes. Northern Pacific R. Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931. Under this view contracts are subject to equitable adjustment in corporate reorganizations so long as they receive "full compensatory treatment" or so long as "each security holder in the order of his priority receives from that which is available for the satisfaction of his claim the equitable equivalent of the rights surrendered." Kansas City Terminal R. Co. v. Central Union Trust Co., 271 U.S. 445, 455, 46 S.Ct. 549, 70 L.Ed. 1028; Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 528–30, 61 S.Ct. 675, 85 L.Ed. 982; Group of Institutional Investors v. Chicago Milwaukee St. P. & P. R. Co., 318 U.S. 523, 565–66, 63 S.Ct. 727, 87 L.Ed. 959; Ecker v. Western Pacific R. Corporation, 318 U.S. 448, 482, 63 S.Ct. 692, 87 L.Ed. 892. And the full priority rule applies to the reorganizations of solvent companies, Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 527, 61 S.Ct. 675, 85 L.Ed. 982.

The cited cases arose under the Bankruptcy Acts, where statutory numerical vote of creditors was required in order to force securities upon creditors.[9] If Congress can enact a law making it possible to alter creditor rights by a two-thirds vote or, even, majority vote, Congress can do it on a 10%, or 5%, etc., vote, or permit an administrative agency or a court

---

[8] The holder of preferred stock is, of course, not a creditor of the company. But if a liquidation or dissolution which is admittedly contemplated by the charter occurs, then his stipulated claim on liquidation or dissolution has matured, and he becomes a creditor of the corporation. Cf. the language in Penington v. Commonwealth Hotel Construction Corporation, 17 Del.Ch. 394, 155 A. 514, 75 A.L.R. 1136. But in the United Light & Power case (Otis & Co. v. Securities and Exchange Commission, 65 S.Ct. 483) the burden of the Commission's argument in this court (D.C.Del. 51 F.Supp. 217), and which was accepted by the Supreme Court, is that a simplification by liquidation under Secs. 11(b) (2) and (e) of the Act does not effect the maturity of the contractual rights of the preferred.

[9] This, of course, is simply an extension of composition.

to do it without creditors' vote when such is in the public interest. This is because the Constitution confers bankruptcy powers upon Congress and in the exercise of that granted power Congress can, when it finds it necessary, alter such rights, for the contract clause of the Constitution is a limitation upon states, and not upon the federal government. So, too, as an incident to the commerce power, Congress may alter creditor rights when such alteration is in the public interest. We hold that here Congress has to date not done so even though the Public Utility Holding Company Act is within Congress' power to regulate interstate commerce, as has been decided in this Circuit. United Gas Imp. Co. v. Securities and Exchange Commission, 3 Cir., 138 F.2d 1010.

■■■ 3. If the first conclusion is invalid and Congress has clothed the Commission, in some instances, with power to require creditors to accept other than cash, then the Socratic question is this: What is the equitable equivalent of the rights surrendered by the Noteholders in this particular case? What constitutes an "equitable equivalent" apparently differs—it must have a duality of meaning—depending upon whether a plan is of a solvent company under the Act or of a company reorganized under the bankruptcy and reorganization statutes, for certain it is that had United Light & Power Company, in Otis & Co. v. S.E.C., 65 S.Ct. 483, been an insolvent railroad, the common stock would have been excluded from all participation under Group of Institutional Investors v. Chicago Milwaukee St. P. & P. R. Co. and Ecker v. Western Pacific R. Corporation, supra. Whatever be the ratio supporting a distinction between the two fact situations, it has now been decided by the Otis & Co. case, supra, that the Noteholders in the instant case are entitled to the equitable equivalent of $1,000. We think that the only equitable equivalent for the rights surrendered under the facts of this case is $1,000 in cash per note. The Noteholders here are creditors of Standard and they have stipulated rights against all assets to be paid in full. The

only certain, sure or complete equivalent of that absolute right is cash. The single question, then, is whether they should be paid cash now, as an incident of the plan, or whether the acceleration payment of their debt obligation requires them to accept as token or wampum payment a different genus of security from that which they now hold. To insist the Stocks are the fair and equitable equivalent of $690 cash is an escape compulsion. When such new securities are actually received (after this court finally enters its decree approving the plan or after the Circuit Court affirms or reverses the action here, or after the Supreme Court does either one or the other), such securities may be worth far less [10] than the debt-contract amount due, and far below a market or appraised value now said to be the "equitable equivalent".[11] The requirement that creditors in a solvent situation accept underlying equity stocks is to force on them a speculation when there exists no factual necessity therefor. Assuming power to modify creditors' rights, exercise of such power must be within the perimeter of fairness and equity. If bondholders of a solvent company are required to accept equity securities in payment of their claim, they do not get the equitable equivalent of their right to be paid the principal of their debt so long as there is, as here, approximately a 2 to 1 asset position, especially if the securities they are required to accept may be worth more or less than $1,000. The Notes are now selling at about 103; several weeks ago they had sales around 96; non constat three months hence, after the plan is finally approved, say, by some appellate court, they may be selling below 90 and beyond the protection of the 3% differential called for in the plan. Assuming that markets correctly appraise values of the securities to be transferred to the Noteholders, the mere fact of fluctuation demonstrates if Noteholders are required to take such securities they are not receiving the equitable equivalent of their absolute right to be paid in full when assets are sufficient to make such payment. No plan should be based on the possibility of the constancy of the security market.

---

[10] That market opinion is that the Stocks may be worth more than $690 is irrelevant. The point is that a debt claim should not be transferred into a speculative equity ownership. And, of course, if it became obvious that the Stocks were worth more than $690 after the terminal date of litigation, the plan might well be unfair and inequitable to Standard's stockholders.

[11] We doubt the efficacy of the 3% differential used by the Commission.

No authority has been cited where a bondholder or other creditor of a solvent company has been forced to take securities or some other substitute for cash, where the solvent company has been compelled either to go out of business or to re-arrange its capital structure, absent some express statutory authority. Cases of solvent companies where objecting creditors are forced to take equity securities pursuant to a vote of creditors as a class are based upon such authority; Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 527, 61 S.Ct. 675, 85 L.Ed. 982; and are obviously not relevant to our inquiry. In the case at bar, the only statutory suggestion is that the court shall find the particular plan fair and equitable. Assuming, as we have before, that Congress has authorized re-arrangement of creditors' rights in a proper case, what fact is there, here, which makes the plan fair and equitable? A 6% bond, where assets are approximately 2 to 1 and interest charges earned by a substantial margin, would in today's market sell above 100.

In support of the argument that the plan is fair and equitable to the creditors, the point is made that the market history shows for long periods of time Standard's notes sold at a sharp discount from par. This argument[11a] is beside the point, for a shrewd Noteholder is only interested in the "intrinsic value" behind his claim and in the amount of earning coverage. Market history is irrelevant to the question of what is fair and equitable to him. Market values are especially unreliable in this case because some of those engaged in buying and selling public utility holding company Notes were of the view that such securities were under the cloud of the Act because they believed it created uncertainties. Several of the fundamental purposes of the Act—to preserve and not weaken values, to prevent injury to investors—were obviously either overlooked or ignored by those supposedly wise in the way of appraising securities. That hindsight demonstrates that the market appraisal of public utility holding company debt securities was erroneous before and after the passage of the Act only serves to emphasize the irrelevancy and unrelia-

bility of market history. If, however, market history were relevant, a fair comparison would be to take a bond of a company, about which there was no such misapprehension as to the purpose of a regulatory statute, where assets are 2 to 1 and fixed charges are earned by approximately 1.52.

These are palpably important criteria in ascertaining whether a plan is fair and equitable to creditors. If we are required to talk about the whole "bundle of rights", it may be if Noteholders are required to accept securities of other companies they should be given securities of a value above the $1,000 principal amount of debt, for the type of 6% bond to which reference has just been made might well sell in the open market today at considerably more than $1,000. The doctrine of Group of Institutional Investors v. Chicago Milwaukee St. P. & P. R. Co., supra, and allied decisions hold that a creditor must be made whole for change in or loss of his senior position by an increased participation in assets, in earnings, or in control, or in any combination of these elements. This teaches that each plan must be designed so that it will be fair and equitable under the circumstances which exist in each particular case and which will surround the particular corporation which is the subject of such reorganization. If creditors of an insolvent corporation are not required to take equity securities without extra compensation for their sacrifice of a creditor position a fortiori creditors of a solvent company should not be required to accept equity stocks without compensation for the surrender of their senior right to be paid cash.

4. The Commission urges legislative history, statutory provisions, and decisions of this and other courts support contentions that distributions in kind should be the "norm" and not the exception. Neither legislative history nor statutory provisions help, for nowhere has anyone supported a prohibition against payment of creditors in cash. Moreover, it is apparent that Congress, in enacting the Public Utility Holding Company Act of 1935, never intended to force speculation on creditors where the assets of a sub-

---

11a Market history is an important factor, however, in considering whether a premium should be allowed, for if the bonds sold at a sharp discount from par, it is obvious that the bondholder is not prejudiced by a premature payment "in cash" in full.

ject and debtor company are approximately 2 to 1. It is unnecessary to consider whether the Commission has correctly interpreted the opinions of this court [12] or whether proper analogies may be drawn from the cases involving bankrupt railroads.[13] Under the facts of this case, we think that, under any of the current views, the only equitable equivalent for the creditor rights surrendered is $1,000 in cash per bond plus interest. For the reasons discussed and elaborated in similar situations, we conclude the creditor is not entitled to the call premium. In the Matter of North Continent Utilities Corporation, D.C.Del., 54 F.Supp. 527; In the Matter of Consolidated Electric & Gas Co., D.C.Del., 55 F.Supp. 211.

■ 5. The delivery of the Stocks to the creditors is not necessary for the plan sub judice to carry out the fundamental purposes of the Act, viz., simplification and integration. There is evidence—certainly as trustworthy as the valuation evidence—that the Stocks can be sold, through an underwriting or otherwise, and the Notes paid in full in cash. That underwriting would involve expense to the debtor and its stockholders is not cogent, for Standard and not Noteholders should bear the expense of converting the Stocks in question into their equitable equivalent of cash, without unfair or inequitable oppression upon the stockholders.[14]

6. No doubt Standard attempts to effectuate compliance by paying off its Noteholders. Standard's corporate structure, including the complicated issues of notes and debentures, will be simplified by their elimination. There are 20,000 Noteholders with an average holding of about $3,000. Expense is involved in payment of trustees' and agents' fees. A substantial amount of work occurs in connection with payment of interest, accounting for the Notes, arrangement for tax refunds and other services. There are terms in all the trust agreements which provide that proceeds of all sales of capital assets must be deposited with the trustees and may be withdrawn only for the purpose of purchase of other capital assets or redemption of the Notes; but, in the second event, such proceeds can not be used for retirement of the Notes until the expiration of a year after their deposit, even if Standard waives its right to use such proceeds for the purchase of other capital assets. During the time of deposit Standard receives little if any income from such assets. Moreover, under present conditions, the common stock which has no value and which has no prospect of dividends under any view now enjoys almost one-half of director representation. Once the Noteholders are eliminated, the corporate structure is simplified—a short term loan of one-fifth of the present debt with its payment in the not too far distant future

---

[12] The Commission relies on this court's discussions in In re United Light & Power Co., D.C.Del., 51 F.Supp. 217; In re United Gas Corporation, D.C.Del., 58 F.Supp. 501; and cases which forced bondholders to accept the face amount of their bonds plus accrued interest in cash without payment of the call premium; In the Matter of North Continent Utilities Corporation, D.C.Del., 54 F. Supp. 527; In the Matter of Consolidated Electric & Gas Co., D.C.Del., 55 F.Supp. 211. The call premium cases are not inconsistent with the instant holding. In those cases the premium was not allowed under the facts because the contingency which occurred was not the contingency which was contemplated in the contract, just as simplification by liquidation under Secs. 11(b) (2) and (e) of the Act was not the type of liquidation contemplated by preferred stockholders in their charter contract. See Otis & Co. v. Securities and Exchange Commission, 65 S.Ct. 483. In both cases

their claim was not regarded as having matured.

[13] The case of In the Matter of New York, New Haven and Hartford R. R. Co., 2 Cir., 147 F.2d 40, upon which the Commission relies, is wide of the mark because that plan obviously involved the substitution of one debt claim for another debt claim—not the substitution of an equity claim for another debt claim as is here proposed.

[14] The expert testimony before the Commission indicates that the Stocks can be underwritten and the Noteholders paid in cash. The cost would be 4.5% or approximatey $2,700,000. This cost Standard would bear. Under the plan the cost to the Noteholders if they sell the Stocks they are to receive would aggregate as much as 7% of their debt.

Unless there is a market cataclysm in the immediate future, there is no hardship in requiring Standard to convert its portfolio equity holdings into cash and pay the Noteholders principal and interest.

through the sale of portfolio securities and application of current income, and one class of stock with voting power in the group who will be the real owners of the corporate enterprise. In short, no one except the common stockholders seriously claim that the elimination of the Noteholders and the re-allocation of interests among the preference stocks is not "necessary" under the Act.

7. The relative participation of the three classes of preferred in the new common stock and elimination of the old common, is found to be fair and equitable; Otis & Co. v. Securities and Exchange Commission, 65 S.Ct. 483; In re United Gas Corporation, D.C.Del., 58 F.Supp. 501. The common stock was sold to the public at fancy prices. The evidence is clear old common has no reasonable expectation of ever participating in earnings or a distribution of assets. This is a regrettable circumstance; but there can be no basis on which the common stock might be permitted to participate.

We agree with the Commission's findings respecting the proper allocation between the $7 and $6 preference stocks. There may be various possible factors bearing on the allocation, but final judgment must rest primarily on earning power and relative dividend position of both classes. Case v. Los Angeles Lumber Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110; Consolidated Rock Products Co. v. Du-Bois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982. The re-allocation in the case at bar is not a liquidation within the contract meaning of their charter agreements; hence, liquidation rights not only have a relatively unimportant part in our considerations, but have no significance at all. See Otis & Co. v. Securities and Exchange Commission, supra. As this follows, the fair and equitable thing to do is to give stock in the new enterprise on the basis recommended by the Commission. Inconvenience of the resulting fractions is, it seems to us, wholly immaterial, for the only factors which should be considered are those noted above.

8. While the holding here makes it irrelevant to discuss views on the question of values assigned by the Commission to the securities to be distributed to the Noteholders, by way of aside, at least, we think Standard has answered the arguments urged by certain of the Noteholders who attack value. The nature and scope of the record and the careful enumeration by the Commission of the facts upon which it relied in making its findings as to the allotments to the Noteholders precludes any claim that the Findings are not supported by substantial evidence. Hearings were held before the Commission on 35 days, covering a period of approximately 16 months. Much testimony was adduced by operating officials of each subsidiary as to the business, assets, liabilities, earnings and values of the Stocks proposed to be distributed to the Noteholders. Like evidence was received as to the property, affairs, and financial condition of Pacific Gas & Electric Company, which is not a subsidiary of Standard. Under the substantial evidence rule,[15] we are required and should follow the "informed" judgment as articulated in the Commission's findings. The situation here is different from that which confronted this court in the Matter of Midland United Co., D.C.Del., 58 F.Supp. 667, 683. There, Judge Biggs was called upon to determine the scope of Sec. 174 of the Bankruptcy Act, 11 U.S.C.A. § 574. He was of the view that under that particular statute this court was required "to exercise its independent judgment in respect to such questions as the valuation of securities involved in the plan." He demonstrated that, under Sec. 24(a) of the Public Utility Holding Company Act, 15 U.S.C.A. § 79 x(a), Congress has written into the body of the statute itself the substantial evidence rule. Examination of testimony and documentary proofs presented to the Commission demonstrates manifestly there was substantial evidence to support the Commission's findings as to the value of the securities to be distributed to the Noteholders under the plan. But, those values are of necessity (and as we tried to show) not static. At least, they are variable enough not to be the equivalent of cash when a Noteholder's debt is actually to be discharged.

9. Standard's argument on the difficulties of selling the stocks of the five underlying companies is likewise not pertinent in view of the holding made herein.

15 It will be observed that Sec. 24(a) of the Holding Company Act provides that "The findings of the Commission as to the facts, if supported by substantial evidence, shall be conclusive."

Standard persists unless all such stocks could be sold simultaneously (which, it contends, can not be the fact) for enough cash to pay Noteholders simultaneously and to discharge the Trust Agreements, proceeds from such sales must be deposited with the trustees under specific provisions of the Trust Agreements and they would be unavailable to Standard for an indefinite length of time. If the Trust Agreement provisions are to be deemed applicable to and a restriction upon sales of Standard's properties which should be sold, the necessity of such sales in order to enable Standard to comply with the Act dispenses with further necessity of imposing any particular indenture restriction. In a situation such as this, a Trust Agreement cannot thwart a valid attempt by a public utility holding company to comply with the mandatory provisions of the Act. See In the Matter of Central States Power & Light Corporation, D.C.Del., 58 F.Supp. 877; In re American Gas & Power Co., D.C.Del., 55 F.Supp. 756.

The plan, which would be approved as to stockholder participation inter sese, will not be approved as fair and equitable and appropriate to effectuate compliance with the Act until a different treatment is afforded the Noteholders. Noteholder objectors may propose a form of decree.