**In re UNITED LIGHT & POWER CO.**
Civil Action No. 303.

District Court, D. Delaware.
July 29, 1943.

As Amended Oct. 4, 1943.

219

Assistant, and John W. Christensen, all of Philadelphia, Pa., for the Securities and Exchange Commission.

Donald R. Richberg (of Davies, Richberg, Beebe, Busick & Richardson), of Washington, D. C., John Dern (of Sidley, McPherson, Austin & Burgess), of Chicago, Ill., and Clarence A. Southerland (of Southerland, Berl & Potter), of Wilmington, Del., for United Light & Power Co.

Richard B. Hand of New York City, and Arthur G. Logan (of Logan & Duffy), of Wilmington, Del., for Otis & Co., intervener.

Townsend, Elliott & Munson, of Philadelphia, Pa., for Committee of Preferred Stockholders of Commonwealth & Southern Corporation, amicus curiae.

LEAHY, District Judge.

This matter is here on an application of the Securities and Exchange Commission pursuant to Sections 11(e) and 18 (f) of the Public Utility Holding Company Act of 1935 [1] "to enforce and carry out the terms and provisions of" a plan of action by The United Light and Power Company for the purpose of enabling Power to comply with the provisions of Section 11(b) of the Act. This court's jurisdiction is based on the fact that Power transacts a substantial portion of its corporate business in this district and thus comes within Sections 18(f) and 25.

The amended plan designed to effectuate the dissolution of Power in accordance with the Commission's order of March 20, 1941, was approved by the Commission on April 5, 1943. It provides in substance for the contribution of cash and certain investments of Power to its subsidiary, The United Light and Railways Company, for the reclassification of the preferred and common stocks of Power into a single class of new common stock by way of the distribution of all the common stock of Railways in the ratio of 94.52% to Power's preferred stockholders, and 5.48% to its common stockholders, the assumption of Power's liabilities by Railways, the transfer of Power's remaining assets to Railways, and, finally, the formal dissolution of Power. The distribution to the common stockholders of Power approved by the Commission

John F. Davis, Sol., Roger S. Foster, Counsel, Robert M. Blair-Smith, Executive

---

[1] In this opinion I refer to the Securities and Exchange Commission as the "Commission"; to United Light and Power Company as "Power"; to United Light and Railways Company as "Railways", and to the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79 et seq. as the "Act".

is less than was originally proposed by the management of Power, who had suggested an 8.8% allocation to Power's present common stockholders. This distribution of a portion of the equity to the old common stock of Power caused one Commissioner [2] to dissent vigorously. Otis & Company, owner of 10 preferred shares, seeks to intervene and objects to approval of the plan, while a committee for the preferred shareholders of the Commonwealth & Southern Corporation, a stranger to these proceedings, filed a brief as amicus curiae in opposition to the plan.

Under the amended plan, Railways' authorized common of 1,000,000 shares with a par of $35—all owned by Power—will be increased to 3,500,000 with a par of $7, each share to have one vote. The outstanding 708,520 shares of Railways' common will then be exchanged by Power for 3,173,838 shares of Railways' new stock. The change in par value of Railways' common will reduce the amount of capital from $24,798,200 to $22,216,866, and the difference of $2,581,334 will be credited to Railways' paid-in surplus account.

The objections to the plan raise no issues of fact. The objections merely endorse the views of Commissioner Healy who broke from the majority of the Commission on an issue of law. That issue will be discussed shortly.

I. *Intervention.* Otis & Co. once acted as an underwriter for the preferred stock and presently owns 10 shares. The Commission thinks it appropriate to permit Otis & Co. to be heard on their objections to the plan on the ground that Sec. 11(e) entitles a security holder to have his objections considered by the district court. Power objects to intervention because notice was given on April 21, 1943, under order of this court, that the hearing on the plan would occur on June 15, 1943, and any persons who opposed approval and enforcement were required to file their objections on counsel for the Commission and Power on or before June 1, 1943. This, Otis & Co.

failed to do. And Power further claims that no excuse for such default or delay has been presented, although Otis & Co. has had knowledge of the proceedings before the Commission for some years. Moreover, Power points out that at no time did Otis & Co. appear in the proceedings before the Commission. Accordingly, Power argues that Otis & Co. should have utilized the opportunity for administrative relief before appealing for judicial relief to correct an error of law on the Commission's part. Finally, Power contends that Otis & Co. should have sought review of the Commission's order of April 5, 1943, in a circuit court of appeals under Sec. 24(a), which provision requires a party who wishes to exercise his right of appeal to show he is a "party aggrieved" and limits his objections to those urged before the Commission.

I think it may fairly be argued that the appeal provided by Sec. 24(a) and an opportunity to be heard before the district court under Sec. 11(e) with the concomitant right to appeal under Sec. 25 to, as here, the Third Circuit Court of Appeals, from the District Court's finding, are alternative rights of appeal.

Otis & Co. relies wholly on the ultimate issue of law which split the Commission; and that was a substantial issue of law which must be determined regardless of whether Otis & Co. is in or out of these proceedings. Whether this court should demand strict compliance with its order of April 16, 1943, and refuse to hear a party who failed to file his objections by June 1, 1943, is obviously a matter resting in the discretion of the court. In this case I think the exercise of discretion should be in favor of Otis & Co.

Procedural analogies on the right of stockholders to be heard and to appeal in 77B and Chapter X, 11 U.S.C.A. § 207, proceedings in bankruptcy offer some help [3]; but I hardly think them applicable here. In my view, I think Sec. 11(e) of

---

[2] Commissioner Healy filed an elaborate dissenting opinion. The position of the intervener, Otis & Co., is based largely —if not wholly—upon the arguments advanced in that opinion.

[3] Under Sec. 77B and Chapter X of the Bankruptcy Act, the right to appeal is tantamount to the statutory right to be heard. In re Day & Meyer, Murray & Young, Inc., 2 Cir., 93 F.2d 657; In re Barclay Park Corp., 2 Cir., 90 F.2d

595. Creditors at one time had a limited right to be heard. Tetzke v. Trust No. 2988 of Foreman Trust & Savings Bank, 7 Cir., 85 F.2d 942, certiorari denied 299 U.S. 609, 57 S.Ct. 235, 81 L.Ed. 450. Chapter X, 11 U.S.C.A. § 501 et seq., enlarged the rights of both creditors and stockholders to be heard. In re Philadelphia & Reading Coal & Iron Co., 3 Cir., 105 F.2d 358; Keystone Realty Holding Co., 3 Cir., 117

the Act supports Otis & Co.'s right to intervene, file its proposed answer—containing its objections to the plan—and be heard. In fact, all this is a fait accompli, as I have already heard Otis & Co. at length. Its right to appeal is a matter which does not have my immediate concern. That is a matter which the circuit court may some day be called upon to answer.

II. *The Plan.* We have merely two issues: (a) is the plan "appropriate to effectuate the provisions of Sec. 11"; and (b) is the plan "fair and equitable".

(a) Power is the apex holding company at the top of a pyramid system. There are subholding companies between Power and the base. One of the principal of these is Railways. The common stock of Railways and cash constitute Power's assets. Railways own the securities representing Power's interest and control in the lower companies. Power will eliminate its stock liability through a distribution of its assets in kind, a method, the Commission has found, which will be both economical and appropriate to effect compliance with Sec. 11(b).

██ Prior to the entry of its order of dissolution on March 20, 1941, extensive hearings were had. No appeal was taken from the order and the time for seeking a judicial review has long since expired. Really the question of necessity for the plan is no longer with us; and critical reexamination of such question is, I think properly, beyond my judicial ken. However, it is clear that the plan is "appropriate to effectuate the provisions of Sec. 11". After review, I accept the findings of the Commission that there is necessity for the plan and for Power to liquidate pursuant to Sec. 11(b) (2).

(b) Is the plan fair and equitable? The charter of Power provides, inter alia, that "Upon the dissolution or liquidation of the corporation, whether voluntary or involuntary the holders of the Class A Preferred stock shall be entitled to receive out of the net assets of the corporation, whether capital or surplus, for each share of such stock, one hundred dollars and a sum of money equivalent to all cumulative dividends on such share, both accrued and in arrears (whether or not the same shall have been declared or earned) including the full dividend for the then current quarterly period, before any payment is made to the holders of any stock other than the Class A Preferred stock in accordance with their rights at the time of distribution." Admittedly, preferred has a principal claim of $60,000,000 and an accumulated dividend charge of $38,700,000. If the dividend claim is capitalized as a matured obligation, the total claim of preferred will be $98,700,000. All parties agree also that the assets represented by the common stock of Railways have not a present value equal to that amount. If the contractual preferences are operative it is clear there will be nothing for the common shareholders.

██ The problem for determination is whether the plan is "fair and equitable". Concededly the plan does not satisfy the "absolute priority" rule which is applied in equity and bankruptcy reorganizations.[4] Under that rule, no plan can be fair and equitable which permits a junior security to retain an interest in the reorganized corporate enterprise before the securities senior to it have been paid in full (but not necessarily in cash) for the rights which they surrender. The value of the reorganized concern is projectively determined by a capitalization of the "guess" earnings of the new concern and comparing the valuation so arrived at with the total claims of the old senior securities. The present plan fails to meet this test, as junior interests are allowed to participate in the new capital structure of Railways when it is conceded that Railways' common is not worth $98,700,000 on any basis of valuation. If the claims of the preferred stockholders are to be treated as matured as in an equity or bankruptcy reorganization, there can be no participation for the common stock under the "absolute priorities" rule.

It was stated in Consolidated Rock Products Co. v. Du Bois, 312 U.S. 510, 61 S.Ct.

F.2d 1003, 133 A.L.R. 1378; and Dana v. Securities & Exchange Commission, 2 Cir., 125 F.2d 542. The right to be heard and appeal, therefore, would seem to obviate formal intervention in bankruptcy.

4 Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110; Consolidated Rock Products Co. v. Du Bois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982; Marine Harbor Properties v. Manufacturers T. Co., 317 U.S. 78, 63 S.Ct. 93, 87 L.Ed. —; Ecker v. Western Pacific R. Corp., 63 S.Ct. 692, 87 L.Ed. —; and Group of Institutional Investors v. Chicago M., St. P. & P. R. Co., 63 S.Ct. 727, 87 L.Ed. —.

675, 85 L.Ed. 982, that the method of valuation formulated with respect to railroad reorganizations—which regards an estimate of future earnings the most important criterion—applies equally to industrials. Does this mean that after valuation has been determined the rights of security holders of a utility must be determined by these same rules in a substantially dissimilar situation?

The Commission concluded that the changed circumstances which a company finds itself in where bankruptcy is present may not be and often is not the changed circumstances a company finds itself in as it attempts to comply with the Public Utility Holding Company Act of 1935. It therefore was of the opinion that "fair and equitable" should be given a different construction under the Public Utility Holding Company Act than had been given in reorganizations in equity and under the Bankruptcy Act,[5] and, in holding bankruptcy techniques inapplicable, consequently refused to treat the claims of the preferred as having matured. The Commission gave participation to the common in the reorganized company, even though the valuation of the reorganized company, as determined by a capitalization of its prospective earnings, was not equal to the $98,700,-000 claim of the preferred stock. Having determined that the value of the reorganized company is insufficient to meet the preferred stock claim, the Commission found it unnecessary to make an over all dollar valuation of the company, for it measured and determined participation according to the substantive rights of security holders as they would exist apart from the required reorganization. In the opinion of the Commission, to mature liquidating preferences would be to add to the value of one class of securities at the expense of the other.

This is a new approach to the problem. The quantity of participation, the Commission found, should be expressed in terms of a percentage of the new stock, without being reduced to dollar figures; and this finding is based, of course, on the proposition that the Commission also found it was not detrimental to the interests of investors.

In other words after capitalizing reasonable prospective earnings, the Commission found that that sum was insufficient to meet the liquidating preferences of the preferred stock by a wide margin. Under the orthodox approach, that would end the problem, and there would be no participation for the common. The Commission, however, to determine participation, projected prospective earnings much further into the future than would be permissible if the rights of the preferred stock were to be treated as matured. In this case even on the assumption of liberal earning power, and on the assumption that all earnings were paid to preferred stockholders, it would take fifteen years to pay off the dividend arrearages. The Commission concedes that the possibility of the common acquiring value is remote; but, nevertheless, it was of the opin that the common should be accorded this right in the light of the possibility that future earnings may prove to be greater.

There are weighty reasons why the junior security holders should have an opportunity to recoup their losses in the future, even though probability of realization is not apparent from an estimate of the prospective earnings within a reasonable time. Especially is this so where (as here) the financial affairs of the corporation are such that it would not be forced to liquidate apart from the necessity of complying with the provisions of the Act. The mere fact that estimated prospective earnings within a reasonable time are inadequate for the common stockholders to recoup their losses should not form a basis for wiping out their interests when under normal conditions they would be entitled to a continuing participation in the enterprise. In short, the common stockholders should be given a chance to recoup, especially where the reason for liquidation is purely fortuitous, and where the future condition of the new enterprise is based on a surmise.

The statement of the principle behind the decision of the Commission was this: "* * * if a class of preferred stock has a reasonable interest in an enterprise absent the maturing of liquidation preferences and a proportionately greater interest upon the maturity thereof, it would not be fair or equitable under the statute to give recognition to the greater interest at the expense and to the detriment of the common stock. And conversely, if the common stock has a measurable interest apart

---

[5] It is significant to note that there is some Congressional dissatisfaction with the "absolute priorities" rule even as applied to reorganizations under the Bankruptcy Act. See H.R. 2857, 78th Cong. 1st Session.

from the maturing of liquidation preferences, we must not sanction the destruction of that interest through the operation of the statutory mandate." The majority's apologia for its break with Commissioner Healy is just as adequate. They explained: "It is pointed out in Commissioner Healy's separate opinion that the words 'fair and equitable' embodied in Section 11 have a settled meaning, as determined by the courts, and that an application of the 'absolute priorities' doctrine must result in no distribution to Power's common stock in this case. But that is because he measures the rights of the preferred stock as they would be measured in bankruptcy cases, and not merely because he follows the 'absolute priorities' doctrine in determining the consequences of the measurement. In other words, we can agree with him when he says that absolute priorities must be respected, because we think that doctrine simply means that the common stock must not be accorded any participation unless the preferred stock has been fully compensated for its rights and priorities. But there the area of agreement stops, because he says further that the rights and priorities of the preferred stockholders are the same here as in bankruptcy cases, where their claims to liquidation preferences (including dividend arrearages) are treated as matured. In our view it would be unconscionable and contrary to the plain intention of Congress to so hold."

There is nothing sacrosanct about the rights of the preferred, and they are not now asked to give to the common what is exclusively theirs. The rights of all parties must be dependent upon the particular facts of each case which comes before the Commission.

A consideration of the basic facts before the Commission supports its special finding of what is fair and equitable under all the circumstances. True, the preferred has a charter claim of $164.50 per share in cash upon dissolution, as that term is ordinarily understood when total corporate assets are either sold privately or on the

block and liquidation, in the sense that total corporate purpose ceases, takes place. But, the Commission has caught the nuance in the present situation. There is no real finality to this particular dissolution. Power's shareholders simply transform themselves into holders of common stock of Railways and thus obey the demands of Congress. Power as the head of a holding company system is now declassé by congressional mandate; the interests of all classes of stock are nevertheless still lodged in a continuing enterprise.

While the preferred's dividend arrearage is a claim upon capital under at least, one decision,[6] I do not think this claim should black-out considerations of common's contribution to that same capital. Common's contribution to capital amounts to $28,482,745—preferred's $60,000,000. After deduction of dividends, net contribution is $19,729,949 for common and $49,461,882 for preferred. But undistributed earnings have been plowed in since 1929—$4,073,155 by common and $38,700,000 by preferred. And while preferred has a capital claim for its par and an arrearages "capital claim" [sic] on non-existing earnings totalling $98,700,000, the plan should not disregard common's capital claim of $19,729,949.

It is neither an exercise in semantics nor a rejection of labels to consider the present plan little more than a reclassification.[7] If it had donned the formal dress of reclassification by way of merger, the prefered may have been met with the issuance of a new stock with a reduced dividend rate and a wiping out of its dividend arrearage claim. In any such reorganization, the mere pittance of 5.48% of Railways' stock thrown to the common would manifestly be regarded as not only fair and equitable but downright generous to the preferred. But the Commission having determined that an allocation of 95% of the equity should go to the preferred, likewise determined that the shortest way to compliance with the Act was direct liquidation without pausing to go through the legal legerdemain of recapitalization followed by formal liqui-

---

[6] Argument that dividend arrearages should not be a claim on capital in all cases made by the writer of this opinion was rejected by the Supreme Court of Delaware in Penington v. Commonwealth Hotel Const. Corp., 17 Del. Ch. 394, 155 A. 514, 75 A.L.R. 1136, in 1931.

[7] In Puget Sound Power & Light Company, Holding Company Act Release No. 4255, approved and enforced by an order of the District Court in Massachusetts on June 10, 1943, there was a recapitalization on a one-stock basis; in short, a recapitalization effected without maturing the liquidation preferences of the preferred.

dation which, in all probability, would have delayed the time the preferred's investment could be put on a dividend paying basis.

■ The Act was a command of the government. Contractual relationships must, ex necessitatae, give slightly in the face of such legislation. It is my view that Congress never contemplated or intended that preferred shareholders of public utility holding companies were to be, if shrinkage of assets occurred, the sole owners of the corporate enterprise. Moreover, the case history of railroads—which gave rise to the "absolute priority" rule—pressed by increased truck and air transportation competition, is no economic analogue to the electric power industry. The railroad industry is decadent, whereas the electric power industry has all the characteristics of growth. This is an additional reason supporting the approach of the Commission in the allocation of participation in the new venture, for the future potentialities of the electric power industry are incalculable.

The approach to values by Commissioner Healy—while based on the facts of Power's earnings—overlooks two propositions: (1) the 1929–38 national depression period for public utilities; and (2) as normal revenues came back into the picture, a heavy taxation schedule made its appearance in the face of an international war. In the light of corporate history, as we have come to know it, such factors of income and expense are abnormalities.

■ The question remains whether the approach of the Commission can be supported under the language of the Act. This particular problem is one of statutory construction. It is urged that the expression "fair and equitable" as used in the Act is a term of art and has a settled meaning, i. e., that the rule of "absolute priorities" must be followed for the plan to be fair and equitable, and that under the well known rule of statutory construction, Congress must be presumed to have used the language it did use to convey the settled meaning. I refuse to accept the application of this rule of construction to these proceedings. The Act marks a radical departure from all previous legislation. Moreover, the dominant purpose of the Bankruptcy Act is the elimination of claims without value (see In re 620 Church St. Bldg. Corp., 299 U.S. 24, 57 S.Ct. 88, 81 L.Ed. 16) whereas the dominant purpose of the Public Utility Holding Company Act is the enhancement of security values

through integration for the protection of investors. Bankruptcy techniques are wholly inapplicable because Power is not insolvent or in any financial difficulty in the traditional bankruptcy or equity sense. I consequently hold that the expression "fair and equitable" as used in the Act does not have the restricted or formal meaning accorded it by the cases supporting the "absolute priorities" rule.

■ The test of fairness under the Act does not involve the application of a precise mathematical formula. Fair and equitable are not arithmetical, algebraic, or geometrical. There can be no hard and fast rule when dealing with these terms. The requirements of "fair and equitable", as the Commission correctly concluded, depend upon the particular setting. The words "fair and equitable" may have a definite meaning given them in reorganizations in equity and under the Bankruptcy Act, but they may also have another meaning where a company is attempting to comply with the provisions of the Public Utility Holding Company Act of 1935, unless the financial condition of such company is such that it faces liquidation apart from the necessity to comply with the statute.

The majority opinion expresses "a more sensitive regard for what is right and what is wrong" in a distribution of assets under the Act. Hence, the Commission's evaluation of what is fair and equitable prompted it to reject the proposition that the common shareholders should be eliminated from any future interests in that enterprise. In considering whether the plan was fair and equitable to the preferred, the Commission took into consideration that the preferred had no voice in the management. There was obviously a small distribution of voting power. Class B common, representing about $4,000,000 of book capitalization, exercised the voting control of the whole system having a consolidated capitalization and surplus of nearly $500,000,000.

■■ After careful consideration of the interests of all its shareholders, Power's management in 1940 originally submitted a plan calling for an 8.8% allocation to their common shareholders. The Commission thought the allocation too high. This fact is not without significance. Preferred stockholders cognizant of the plan for over two years made no opposition. Widespread acceptance by a class of shareholders of a tactic which looks to dilute

their financial interest in their corporate enterprise is a reality which no court should disregard. It seems to me a powerful argument for court approval of a plan of distribution of the property of a public utility holding company when not only the Commission recommends, but also where the plan is considered by practically all the owners of such property to be fair and equitable. The interest behind the 10 preferred shares of the dissidents, when compared with the 5% allocation to all the common shareholders, might very well fall into the realm of de minimus. Such a view brings a rule of life into a rule of law.

 In my opinion, the expression "fair and equitable" should be given its ordinary non-technical meaning. As stated before, the dominant purpose of the Act is the protection and enhancement of public utility security values through integration. But the application of the "absolute priorities" test would in many cases wipe out the interests of stockholders who, save for the passage of the Act, would be entitled to a continuing participation in the enterprise. The expression "fair and equitable", in its ordinary connotation, does not impel such a result; and I will not ascribe such an unnatural intention to Congress. Moreover, it must be apparent that, as I have indicated above, there are many ways to effectuate the purposes of the Act; and, in many cases, the junior securities' holders would be entitled to a participation if other methods of reclassification are utilized. The choice of procedural alternatives should not affect the substantive rights of the common shareholders.

I believe there exists judicial authority which supports the new approach of the Commission. In Securities & Exchange Commission v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 460, 87 L.Ed. ——, the Supreme Court, in considering the fair and equitable standard proposed by the Act, said: "Determination of what is 'fair and equitable' calls for the application of ethical standards to particular sets of facts. But these standards are not static. In evolving standards of fairness and equity, the Commission is not bound by settled judicial precedents. Congress certainly did not mean to preclude the formulation by the Commission of standards expressing a more sensitive regard for what is right and what is wrong than those prevalent at the time the Public Utility Holding Company Act of 1935 became law."

The remaining question is whether the particular plan comes within the standards of fair and equitable as set forth in the Chenery Corp. case. I think the plan abundantly meets these standards. The Commission must have considerable discretion and its informed judgment is entitled to considerable weight. There is no suggestion anywhere that, assuming the Commission has the power to give common anything, 5% is too large. And moreover, if the Commission's estimate as to earnings (which estimate furnished the basis of the common's participation) is too high, the preferred stockholders who receive 95% of the common stock are only damaged to the extent of 5% while, if the Commission's estimate is too low, the common stockholders would be damaged to the extent of 95% or more. In view of the uncertainties of the future, and in view of the fortuitous liquidation of the old company, I think the participation accorded the common is fair and equitable to all classes of stockholders.

Accordingly, I approve the plan as fair, equitable and appropriate to effectuate the provisions of Sec. 11. A proposed form of decree may be submitted.