## BAILEY et al. v. TUBIZE RAYON CORPORATION.

### Civil Action No. 351.

District Court, D. Delaware.

July 31, 1944.

James R. Morford (of Marvel & Morford), of Wilmington, Del., and Spencer Pinkham, of New York City, for plaintiffs.

C. F. Richards and C. S. Layton (of Richards, Layton & Finger), both of Wilmington, Del., and Cadwalader, Wickersham & Taft, of New York City, for defendant.

LEAHY, District Judge.

Holders of an aggregate of 1137 shares of Non-Cumulative Class A $1 seek to enjoin the defendant from enforcing as to them an amendment to defendant's certificate of incorporation, adopted under Sec. 26 of the Delaware Corporation Law, Rev. Code 1935, § 2058, as amended by 43 Del. Laws, c. 132, § 5, which changed its Class A and Common stock into a single class of new common stock. The present action was commenced after the amendment had become effective. No temporary injunction

was sought. The matter is here on pleadings, testimony and oral argument.

Plaintiffs' action is predicated upon two primary contentions: (1) That the reclassification effected by the amendment was unfair to plaintiffs and (2) that the amendment was accomplished by a group of stockholders who owned a majority of the Class A and Common stock and who acted for their own benefit, in breach of their fiduciary obligations to the minority. Plaintiffs do not contend that defendant lacked the power to effect the amendment or that there was a failure to comply with the Delaware Statute. Before discussing the contentions, a reference must be had to the facts.

Prior to the amendment, defendant had outstanding $4,465,000 principal amount of Fifteen Year Sinking Fund Bonds, 24,395 shares of 7% Preferred Stock $100 par, 138,814⅞ shares of Class A $1 par,[1] including 523⅞ shares held in the treasury, and 300,050 shares of Common $1 par, including 636¾ shares held in the treasury. Capital structure and asset situation of defendant appears from its balance sheet as of September 30, 1943, which is set forth in the margin.[2]

---

[1] Plaintiffs advance the argument that this Class A stock really had an effective par of $100, or that it was $100 stock, because it had a preferential right to $100 per share on liquidation and was entitled to a $7 non-cumulative dividend. The Class A stock was also redeemable at $105. While I agree with this particular contention of plaintiff, for reasons hereinafter stated, I do not believe that it is of sufficient importance to militate against the fairness of the plan.

[2] TUBIZE RAYON CORPORATION
BALANCE SHEET, SEPTEMBER 30, 1943
ASSETS

Current Assets:
| | |
|---|---:|
| Cash on hand and demand deposits | $ 4,722,266.75 |
| Cash on deposit for dividends | 180,744.62 |
| U. S. Government securities and accrued interest | 4,011,785.69 |
| Trade acceptances receivable | 117,355.10 |

Accounts Receivable:
| | |
|---|---:|
| Customers (less reserve for doubtful accounts—1943, $68,852.14) | 971,216.75 |
| Other (including royalties receivable—1943, $40,637.71) | 93,334.13 |

Inventories (at cost, which is not in excess of market):
| | |
|---|---:|
| Finished goods | 193,974.32 |
| Greige goods and work in process | 705,535.54 |
| Materials and supplies | 1,222,270.24 |
| Total Current Assets | $12,218,483.14 |

| | |
|---|---:|
| Accounts Receivable—U. S. Government post-war refund of excess profits tax | $ 354,435.79 |

Property, Less Reserves for Depreciation:
| | |
|---|---:|
| Land | $ 800,672.30 |
| Buildings | 5,797,800.55 |
| Machinery and equipment | 12,218,271.42 |
| Uncompleted additions | 199,252.15 |
| Other fixed assets | 218,328.25 |
| | $19,234,324.67 |
| Less: Reserve for depreciation | 10,192,797.36 |
| | $ 9,041,527.31 |

| | |
|---|---:|
| Patents, Licenses and Other Intangibles | $ 7,501.00 |

Deferred Charges:
| | |
|---|---:|
| Unexpired insurance premiums | $ 204,304.14 |
| Other | 119,227.30 |
| Total Deferred Charges | $ 323,531.44 |
| Total | $21,945,478.68 |

The Class A stock entitled holders thereof to non-cumulative dividends, when and as declared by the board of directors of the defendant, at the rate of $7 per share per annum before any dividends could be paid on the Common stock. While Class A was also entitled to $100 per share on liquidation in priority to the Common stock, it and Common stock had a par value of $1 each and entitled the holders thereof to one vote per share at all stockholders' meetings. The reclassification amendment changed the shares of these two classes of stock into 705,282 shares of new Common stock, including 2,414 treasury shares, of which the Class A stockholders were given 78.7% and the Common stockholders 21.3% or, stating it in another way, the holder of one share of Class A stock received eight times as much new Common stock as the holder of one share of old Common stock—each share of Class A stock was changed into four shares of new Common stock and each share of old Common stock was changed into one-half share of new Common stock. Plaintiffs contend that the reclassification amendment was unfair because the old Common stock had

<hr>

## LIABILITIES

Current Liabilities:
Accounts payable:

| | |
|---|---|
| Trade creditors | $   497,204.24 |
| Other | 32,890.62 |

Dividends payable .......................................   180,768.25

Accrued liabilities:
Taxes:
Federal—current year:

| | |
|---|---|
| Normal income and surtax | 491,329.95 |
| Excess profits (less current reduction due to debt retirement: 1943 $110,000,000) | 1,855,319.78 |
| Declared value excess profits | .......... |
| State income | 44,050.27 |
| Federal and State income and excess profits—Prior years | 1,367,974.04 |
| Federal and State (other than income) | 196,486.30 |

Interest:

| | |
|---|---|
| On debentures | 65,114.55 |
| Other | ........ |
| Salaries and wages | 64,229.76 |
| Other | 47,290.55 |

Total current liabilities .........................$ 4,842,658.31

Reserve for Contingencies ..............................$   257,486.12

Funded Debt—3½% Sinking Fund Debentures, due November 1, 1956 (sinking fund payments due within one year from September 30, 1943—$380,000.00) ..............................$ 4,465,000.00

Capital Stock:
7% Cumulative Preferred—authorized, 50,000 shares of $100 each; preference on liquidation, $110 a share plus accrued dividends; issued, 24,395 shares .............................$ 2,439,500.00

$7 Non-cumulative Convertible Class A—authorized 175,000 shares of $1 each; preference on liquidation (subordinate to Preferred Stock) $100 a share; issued—1943, 138,814²⁄₇ less 523⁶⁄₇ shares in Treasury ....................................$   138,290.42

Common—authorized, 700,000 shares of $1 each; issued, 300,050 shares, less 636¾ shares in Treasury ................$   299,413.50

Total Capital Stock ..........................$ 2,877,203.92

Surplus:

| | |
|---|---|
| Capital and paid-in | $ 5,120,193.68 |
| Earned | 4,382,936.65 |

Total surplus ..............................$ 9,503,130.33

Total .....................................$21,945,478.68

merely a token value and the old Common stockholders were entitled to no substantial recognition in the reclassification. True, prior to the amendment the Class A stock had an asset value of $71.85 per share, and the old Common was under water to the extent of $12.96 per share. Subsequent to the amendment the new Common had an asset value of $14.14 per share. The question for determination is, therfore, whether on the basis of defendant's business, assets and earnings, the respective rights of the holders of the two classes of stock, and the market value of the two classes the amendment was fair.

Manifestly, on an asset basis the Common stock was under water. I shall not pause to discuss much of the statistical data offered at the trial; but I wish to state that it was of great help to me when I came to study the case, and counsel are to be commended for preparing for the court's benefit the lucid tables and diagrammatic charts symbolizing the corporate and financial factors called into action.

■ 1. *Fairness of the Plan.* Defendant is engaged in the manufacture of rayon yarn and of knitted fabrics made therefrom. Since 1936 defendant has expended approximately $10,000,000 for plant expansion resulting in increased capacity of its plants of approximately 150%. There was much testimony that the manufacture of rayon is a growth industry. The management of defendant, according to the testimony, made an exhaustive study of the post-war prospects for the industry and developed plans for further increase of defendant's productive capacity. The reason given for the amendment is that the possible post-war expansion program could be more easily effectuated if defendant's capital structure were first simplified. This is clearly an adequate business reason for the amendment, irrespective of whether the post-war expectations of the directors are ever realized. The directors are endeavoring to prepare defendant to take advantage of any post-war expansion opportunities which may arise. But, the reasons for the amendment or the business necessity behind it are not matters for judicial determination. Allied Chemical & Dye Corp. v. Steel & Tube Co., 14 Del.Ch. 1, 120 A. 486; Cole v. National Cash Credit Association, 18 Del.Ch. 47, 156 A. 183; MacFarlane v. North American Cement Corp., 16 Del.Ch. 172, 157 A. 396; MacCrone v. American Capital Corp., D.C.Del., 51 F.Supp. 462, 463. Yet, in passing, it seems to me the amendment was planned with constructive intent.

■ Where a majority of the stockholders and directors of a Delaware corporation, acting in good faith, speak for the corporation by taking action under appropriate statutory and charter provisions, a presumption of fairness arises in favor of such action. Under the Delaware decisional and statutory law an amendment will not be condemned unless it is so unfair as to amount to constructive fraud. Allied Chemical & Dye Corp. v. Steel & Tube Co., 14 Del.Ch. 1, 120 A. 486; Cole v. National Cash Credit Association, 18 Del.Ch. 47, 156 A. 183; MacFarlane v. North American Cement Corp., 16 Del.Ch. 172, 157 A. 396; Porges v. Vadsco Sales Corp., Del.Ch., 32 A.2d 148. Clearly, the plan sub judice would not be condemned under the Delaware decisional law. I prefer, however, in this case to leave the limits of the "gross unfairness" or "constructive fraud" tests as fixed by the Delaware decisions and look at the facts of the case before me to see if the amendment is fair in the light of the practical adjustments inherent in this particular transaction. Cf. MacCrone v. American Capital Corp., D.C. Del., 51 F.Supp. 462, 466; Barrett v. Denver Tramway Corp., D.C.Del., 53 F.Supp. 198.[3] Unless the act of the majority of the directors and stockholders is so palpably unfair as to afford no basis for a difference of opinion among reasonable men, the court should not substitute its judgment for that of the stockholders and directors. I think the amendment meets any independent test of fairness.

---

[3] In Barrett v. Denver Tramway Corp. I specifically sought instructions from the Circuit Court whether the district judge in passing on the question of fairness of a reclassification or recapitalization plan was bound under Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, to apply state law or whether the lower federal court might apply its own independent test as to "fairness". On the date of the opinion in the case at bar, the Circuit Court has not as yet filed its decision in the Barrett case. I am, therefore, following the same course I took in MacCrone v. American Capital Corp., i. e., applying first the litmus of the Delaware decisions, followed by an independent "federal" examination of the plan to test the question of fairness.

It is plaintiffs' theory that the right to $100 in liquidation is deemed to have matured as a result of the amendment. This theory has been rejected in this court and in this circuit. Goldman v. Postal Telegraph, Inc., D.C.Del., 52 F. Supp. 763; Hottenstein et al. v. York Ice Machinery Corporation, D.C.Del., 45 F. Supp. 436, affirmed, 3 Cir., 136 F.2d 944. Cf. In re United Light & Power Co., D.C. Del., 51 F.Supp. 217, affirmed In re Securities and Exchange Commission, 3 Cir., 142 F.2d 411. The rule in this circuit is clear that the preferential right of the Class A stockholdes to receive $100 in liquidation gives them no present interest in any portion of the defendant's assets. That right would arise only upon the liquidation of the defendant and, since defendant is engaged in a profitable going business, it is impossible to foresee ultimate liquidation values of the company.

Consideration of the factors usual in testing a plan will show that the amendment was fair to the Class A stockholders.

(a) The amendment was fair in the treatment of the interests of the Class A stockholders in the assets of the defendant. The defendant's balance sheet as of September 30, 1943, shows that it had a total surplus of $9,503,130. The only right which the Class A stock had to such surplus was the right at some indefinite future time to receive $100 per share on liquidation. But this right is contingent upon liquidation. Plaintiffs ignore the fact that a great portion of the assets which they now claim could have been declared as dividends to the old Common. Clearly, the Class A stockholders, prior to the amendment, could not claim any portion of the defendant's surplus by reason of the fact that all of the earnings available for dividends on the Class A stock up to $7.00 per share had not been declared and paid to them as dividends. Under the rule of Wabash R. Co. et al. v. Barclay et al., 280 U.S. 197, 50 S.Ct. 106, 74 L.Ed. 368, 67 A.L.R. 762, where earnings available in any year for dividends on the Class A stock are not paid but are plowed back into the business "the right for that year was gone" and the Class A stockholders would not be entitled thereafter to assert a claim in respect to such unpaid dividends. Prior to actual liquidation, the right of the Class A stockholders to the $9,503,130 of defendant's surplus is no better than the claim which the old Common stockholders had therein.

Another test shows the Class A stockholders were fairly treated from the standpoint of their interest in defendant's assets. The defendant's assets may properly be measured by capitalizing earnings. There was offered in evidence a calculation of the probable post-war income of the defendant. The average annual income for the years 1939–1941, for example, after providing for preferred stock dividends and all other prior charges, was $1,137,532. Class A stockholders receiving 78.7% of the new Common stock would, therefore, be entitled after the amendment to 78.7% of these earnings, or $895,237. Capitalizing this sum at 6% will yield a value of $14,920,628, which, compared with $13,881,429, discloses more than $100 per share and more than the aggregate par value of all the Class A shares, assuming that they had an actual par value of $100 per share. Thus, on the basis of prospective earnings, it is apparent that plaintiffs were fully compensated for their former interest in defendant's assets. This is one of the methods applied in this circuit in Hottenstein et al. v. York Ice Machinery Corp., D.C.Del., 45 F.Supp. 436, affirmed, 3 Cir., 136 F.2d 944. That case involved the fairness of the treatment of a class of 7% Cumulative Preferred stock in a merger. On the basis of the Ice Company's balance sheet, the common stock was under water. The district court, nevertheless, found that the merger which gave something to the common was fair to the preferred stockholders. At page 438 of 45 F.Supp., Judge Watson said:

"The question of fairness here involved relates only to the distribution of the stock of the resulting corporation as between the preferred and common stockholders of the defendant. The value of the preferred stock, if the common stock has any value, is approximately $10,000,000 including accumulated dividends. Therefore, if the value of the interest which the preferred stockholders receive under the plan of merger is as much or more than $10,000,000, it certainly is not so grossly unfair as to shock the conscience of the court. And, insofar as the interest given to the preferred stockholders has less than that value, the plan approaches the point at which it must be deemed so unfair that the merger should be enjoined.

"* * * Neither side offered testimony as to the probable future earnings of the company. The evidence received dealt only with the past earnings of the company up

to September 30, 1941. While the past earnings of a corporation are ordinarily of considerable value in estimating probable future earnings, in the present case they are insufficient to form the basis of anything but the wildest guess as to the probable future earnings. The amount of income available for stock dividends has varied as much as a million dollars in the ten years prior to September 30, 1940, and over that period the corporation suffered an operating loss of approximately $150,000. On the other hand, the evidence also reveals that the defendant had an income subject to sinking fund arrearages, available for dividends in the year 1941 of between $800,000 and $1,200,000. Under the plan of merger, the preferred stockholders receive eighty-three and two-tenths per cent. (83.2%) of the stock of the resulting corporation. Therefore, if the lesser figure for 1941 were considered as an approximation of the probable future earnings of the company, there would be available for dividends on eighty-three and two-tenths per cent. (83.2%) of the stock the sum of $665,600, or six per cent. on approximately $11,000,000.00. Thus, again, the evidence received fails to establish that the plan of merger is unfair."

It is clear, then, on asset basis the amendment will meet any reasonable test of fairness.

(b) The market values of the shares of the two classes sustain the pecentages upon which the amendment was based. During practically the entire period from June, 1932, when the Class A stock and the old Common stock were originally issued, down to the date of the amendment, the market value of the shares of these two classes on the New York Curb Exchange stood in the ratio of one or more for the old Common to eight for the Class A. Since these shares were traded upon the free exchange their price is a good indication of what investors thought was the relative value of the two classes of stock.[4] This is especially significant since the stated ratio existed long before there was any thought of the present amendment.

■ (c) The amendment treated the Class A stockholders fairly from the standpoint of defendant's earnings. I think that in appraising the relative values of two classes of stock in a going concern, earnings are a matter of much importance. Cf. In re United Light & Power Co. D.C.Del., 51 F.Supp. 217, affirmed In re Securities and Exchange Commission, 3 Cir., 142 F.2d 411. The recent earnings of defendant would divide between Class A and Common stock on a per share basis after giving the Class A their full $7 per annum when earned, the ratio of approximately eight to one. Plaintiffs contend, however, that the recent earnings were unusually good and that the recent years are the only years in which the ratio did hold good. True, the ratio did hold good only in recent years, but it must be remembered that the company in 1936 commenced a major expansion program which cost approximately $10,000,000 and, consequently, the earnings of recent years are the only ones which reflect this expansion program. In view of this fact and the anticipated post-war expansion, it is reasonable to take only the recent years in considering the earnings of the company. Upon the basis of recent earnings and reasonable prospective earnings the amendment is fair to the Class A stockholders.

■ There was much evidence offered relative to the future of the rayon industry in the United States. There is some agreement and I think the testimony supports the conclusion that the rayon industry is a growing industry in the sense that production and consumption will continue to increase in the post-war period. Plaintiffs, however, offered much testimony to indicate that productive capacity would be so great that there would probably be a recurrence of the price war which existed in 1938 and that while production and consumption might expand, profits would tend to decline. This may prove to be the case, but I do not think that plaintiffs have met the burden of proof (which is on them) that such will be the fact. How far plaintiffs' proof falls short of sustaining their burden is made clear by the following illustration: Prior to the war Italy, Japan, the Netherlands, France and Germany in the order named, were the chief rayon exporting countries. It is quite apparent that the enemy countries, where so much fighting is going on, will not be able to immediately regain their pre-war competitive position after the termination of hostilities; and it may be that the peace sanctions imposed on certain of those countries will withdraw

4 In Geller v. Transamerica Corp., D.C. Del., 53 F.Supp. 625, 630, I discussed more fully the significance of prices of stocks listed on the New York Curb Exchange.

them as competitors or, at least, greatly weaken their position in world markets.

(d) On the basis of various intangible factors the amendment treated the Class A stockholders fairly. Evidence offered by defendant (which I accept) shows that upon a consideration of certain intangible factors the directors were justified in allocating 21% interest in the new Common to the holders of the old Common stock The most important intangible factor was the surrender by the old Common stockhlders of voting control. Plaintiffs claim that because a certain group owned both Common and Class A stock this was not, in fact, a surrender of voting control. This argument is beside the mark for the particular identity or community of holdings is unimportant. The important thing is that the Common stock, as such, gave up its voting control; that is a thing of value. Cf. Maddock et al. v. Vorclone Corp., 17 Del.Ch. 39, 43, 147 A. 255, 256.

I conclude, therefore, that the amendment was fair to the Class A stockholders.

2. The members of the board of directors of defendant held or controlled an aggregate of 50,550 shares of old Common stock, or 17% of the class outstanding, and 19,707 shares of Class A stock, or 14% of the class outstanding. After the amendment these directors now own or control 104,103 shares of new Common stock, or 15% of the class outstanding. Plaintiffs argue that these holdings constitute a practical voting control of defendant. Since I am of the opinion that the amendment is fair to the Class A stockholders, the question of "improper control" becomes moot. But, since plaintiffs made so much of this point, I shall pause to consider it. It is true that there was, in fact, an identity of holdings in both Class A and old Common stock among this group of shareholders. Plaintiffs contend, as I understand the argument, that this is a fact to be considered in every case in determining whether a plan or an amendment is fair. I do not understand plaintiffs to contend that this fact per se would make an otherwise fair amendment unfair, but merely that it is a circumstance to be considered in passing on fairness. If directors or stockholders of a corporation, by appropriate action, have the power to effect a particular change, their motive for doing so is not a relevant consideration in determining the question of objective fairness. Cf. Gans v. Delaware Terminal Corp., 23 Del.Ch. 69, 2 A.

2d 154, and MacCrone v. American Capital Corp., D.C.Del., 51 F.Supp. 462.

I am accordingly of the opinion that the complaint should be dismissed. Separate findings of fact and conclusions of law have been filed.