**In re ENGINEERS PUBLIC SERVICE CO.**
**Civ. No. 995.**

District Court, D. Delaware.
May 15, 1947.

Roger S. Foster, Sol., Sidney H. Willner, Asst. Sol., Harry G. Slater, Chief Counsel, Utilities Division, Bernard Kanton, Jerome S. Katzin and Myer Feldman, Attys., all of Philadelphia, Pa., for the Securities and Exchange Commission.

William E. Tucker and Paul D. Miller (of Mudge, Stern, Williams & Tucker), both of New York City, for Engineers Public Service Co.

Francis H. Scheetz, of Philadelphia, Pa., and Caleb R. Layton, III, of Wilmington, Del., for Home Ins. Co. and other preferred stockholders.

Lawrence R. Condon, of New York City, Frederick Zazove, of Chicago, Ill., and Edwin D. Steel, Jr. (of Morris, Steel, Nichols & Arsht), of Wilmington, Del., for Thomas W. Streeter, Dissenting Minority Director of Engineers, and preferred stockholders.

Alfred Berman and J. Howard Rossbach (of Guggenheimer & Untermyer), both of New York City, and Herbert L. Cobin, of Wilmington, Del., for Central-Illinois Securities Corporation and Christian A. Johnson, common stockholders.

Louis Boehm, Raymond L. Wise, and William Esbitt, all of New York City, for common stockholders.

LEAHY, District Judge.

A § 11(e) court has the affirmative and independent duty to consider and find whether a proposed plan, which has been approved by the Securities and Exchange Commission, is fair and equitable. In the Matter of Interstate Power Company, D.C.Del., 71 F.Supp. 164. The first question is whether the various series of preferreds are entitled to amounts in ex-

cess of $100 per share plus accrued and unpaid dividends. When a company is subject to the Act, the quantum of participation of the various security holders is determined by the application of fair and equitable standards to particular fact situations. In re United Light & Power Co., D.C.Del., 51 F.Supp. 217; In re Consolidated Electric & Gas Co., D.C.Del., 55 F. Supp. 211; In the Matter of Community Gas and Power Company, D.C.Del., 71 F. Supp. 171; In the Matter of Interstate Power Company, D.C.Del., 71 F.Supp. 164. The application of those principles convinces me that to pay the premium here would result in a failure to satisfy those standards by a wide margin.

Certain common stockholders argue that this plan involves a true liquidation as distinguished from the fictitious liquidation involved in Re United Light & Power Co., D.C.Del., 51 F.Supp. 217, affirmed 3 Cir., 142 F.2d 411, 413, affirmed sub nom. Otis & Co. v. Securities and Exchange Commission, 323 U.S. 624, 65 S.Ct. 483, 89 L. Ed. 511, and that consequently the stock rights of the various security holders are not to be treated as though in a continuing enterprise. Since this is a true liquidation, the parties argue, the charter provisions do apply and therefore the preferreds are not entitled to a premium. The charter in this case provides that the preferreds shall be entitled to a premium only in the event that the winding up is voluntary; and this and other courts have held that where a company must change its capital structure because of the impact of the Act, the winding up or reorganization is not voluntary.[1] See In re Consolidated Electric & Gas Co., D.C.Del., 55 F.Supp. 211; In re North Continent Utilities Corp., D.C. Del., 54 F.Supp. 527; City National Bank & Trust Co. of Chicago v. S. E. C. and North American Light & Power Co., 7 Cir., 134 F.2d 65; New York Trust Co. et al. v. S. E. C., 2 Cir., 131 F.2d 274. This is ingenious argument and, if accepted, would of course be dispositive of the holding that payment of the premiums would not be fair and equitable. I prefer not to definitely decide this particular point but to consider the charter provisions of the company as but one of several factors in determining the relative rights of the various security holders.[2] In most of the cases which have arisen involving the payment of premiums, In re United Light & Power Co., D.C.Del., 51 F.Supp. 217; In re North Continent Utilities Corp., D.C. Del., 54 F.Supp. 527; In re Consolidated Electric & Gas Co., D.C.Del., 55 F.Supp.

[1] It is interesting to note that in the Matter of Consolidated Electric & Gas Co., supra, the Commission argued that a liquidation made necessary by the impact of the Act is not a voluntary one. See page 3 of the memorandum of the Commission, where it said: " * * * and (2) that the present proposal for the retirement of Federated bonds is not the voluntary act of Consolidated but is the result of the impact of Section 11 of the Act." Now independently of the previous argument of the Commission and the prior holdings on the matter, it seems obvious that a plan, whether submitted by the company or the Commission, is not a voluntary plan. Congress has ordained certain action and when the company takes such action it can be said to be voluntary only in a Pickwickian sense.

[2] Although I have an entirely open mind on the question, my present thought is that the rule of Otis & Co. applies also to a situation in which there is a true liquidation rather than a nominal or formal liquidation mainly because this is not a change in corporate form contemplated by the charter. But counsel argue forcefully that Otis & Co. by its stress that the court was there concerned with a continuing enterprise impliedly holds that a different result would obtain in a true liquidation. I think that perhaps Otis & Co. was not intended to go that far. When a novel question is before the court, it frequently grabs any and all reasons in support of its conclusion. It does not follow, however, that any one of those facts is the sine qua non for the decision.

It is, of course, true that once the charter is not accepted as controlling, there is no reason why 100 is the necessary figure for a senior security holder to receive. It may be more or it may be less. But, in this case, after consideration of all factors involved, I conclude that $100 would be fair and equitable, but that the payment of premiums would not be fair and equitable.

Moreover, there is respectable opinion that a contractual obligation may be overridden in any case where necessary to achieve an otherwise constitutional purpose. Norman v. Baltimore & Ohio Railroad, 294 U.S. 240, 55 S.Ct. 407, 79 L. Ed. 885, 95 A.L.R. 1352 (Gold Clause Case).

211; In re Standard Gas & Electric Co., D.C.Del., 59 F.Supp. 274, the charter has called for the payment of premiums in cases of liquidation and redemption, but notwithstanding this fact both the SEC[3] and the courts have held that under the particular fact situations the payment of premiums was not warranted on considerations of all the facts involved. As stated, the charter provisions, then, are but one circumstance looking toward non-payment of premiums.

The facts in this case indicate that the issuing price and market history also look toward non-payment of the premium. None of the three series of preferred stocks was initially sold to the public for more than $100 per share. In order to sell the preferreds at these prices it was deemed expedient to attach a "convertible" feature to the $5 series and warrants to the $5.50 series. It is unnecessary to consider what the value of these privileges was; it is sufficient that even with these privileges the stock did not command a premium. Moreover, there is no showing that the company received the amounts which the public paid for the various issues of preferred. There must have been various underwriting fees and the underwriting spreads in vogue at the time were quite large. When the inquiry is as to the relative rights of the preferreds vis-a-vis the common, the important consideration is not what the preferred security holders paid, but how much the company received for their stock. Since it is practically certain, then, that the company did not receive as much as $98 per share for any of the three series of preferreds and since none of the three series was initially sold to the public for more than $100 per share, clearly, with respect to this factor, there is no consideration of colloquial equity why the preferreds should be paid a premium.

The market history ex the conversion and warrant privileges has shown an average price much below $100 per share. The importance of the conversion and warrant features is demonstrated, for example, by the lower average price of the $6 preferred since issued than the other two series of preferreds. Another circumstance to be considered, although not strictly one of market history, is that dividends were omitted from preferreds from July 1, 1933 to July 31, 1936, but such arrearages which accumulated in this period were paid off in 1936 and 1937. The market history accordingly not only fails to support the preferred's claim to a premium, but affords affirmative support to the non-payment of the premium.

The preferreds[4] argue for a different conclusion largely on the basis of uncontradicted expert testimony of Dr. R. A. Badger, i.e., on the basis of items "all charges and preferred dividends earned", "proportion of prior obligations to total capitalization", "book value of equity per share of preferred", "percent of quick net assets to prior obligations" and "times parent company dividends were earned", a present value for these preferreds substantially in excess of the charter liquidating preferences would be indicated. I accept Dr. Badger's values and, in the absence of a showing of changed circumstances, I shall assume that those values are applicable at the present time. It must be conceded, however, that these values are not controlling because the plan itself does not propose to give these amounts to the preferreds. Further, it is unnecessary to decide whether these values would more than offset the other factors previously considered and consequently justify the payment of a premium, for in this case this factor is neutralized and rendered impotent by several other considerations. What the plan overlooks is that this is

---

[3] The Commission has taken the position that ordinarily, but not necessarily, the redemption price should fix the ceiling as to the amount which a preferred or debenture may receive.

[4] It is interesting to note that the Commission not only did not recognize "present investment value" as the appropriate standard for measuring the rights of Engineers' preferred stocks, but actually prohibited Engineers from liquidating 35,000 shares of such stock at a time when the market appraised their "present investment value" at $61—$74 per share, and despite the fact that Engineers' charter granted it the unqualified right to make such repurchases so long as the price paid was less than the redemption price.

not a one-way argument but a two-way argument. The necessity and impact of the plan which makes the preferreds give up this present enhanced value also works to the detriment of the common. In order to comply with the divestment orders, many of the assets of Engineers were sold for less than the carrying value on Engineers' books, and many of such securities thus disposed of subsequently increased in market value or capitalized earning power greatly in excess of the amounts realized by Engineers upon their sale. In short, the forced divestment orders have worked a hardship on both the common as well as the preferred stocks.

Moreover, and what is probably more important, a significant reason why the present preferreds are able to be evaluated at more than their redemption prices is because of retained earnings over a period of years not paid as dividends to the common stockholders. The past sacrifices and contributions of the common [5] contributed significantly to the present value of the preferreds.

■ The preferred stockholders will receive every dollar which the common contracted to pay them, with the result that the preferred will have gotten back approximately $190 for every $100 which they, or their predecessors, initially invested in the enterprise. But fairness and equity do not require that the preferred stockholders be paid an additional $3,200,-000 for the theoretical future deprivation of their present excessive dividend rate, for in each case the inquiry is one of relative rights based on colloquial equity. In short, there is no reason why the preferreds should get additional compensation for the termination of the lucrative dividend rate which preferreds have received, when this termination results wholly and directly from frustration of the enterprise by governmental edict. The argument for payment of the premium is comparable to dealing cards off the top of a deck. When full hands (based on theoretical "investment value") have been dealt to all the senior security holders, the common would merely get whatever happens to remain. Under the Act the interests of all investors must be considered. An emphasis on a preferred's rights must not slight the interests of a common stockholder. For if this occurs this is the direct opposite of the arguments utilized in Re United Light & Power, D.C.Del., 51 F. Supp. 217, affirmed 3 Cir., 142 F.2d 411, 413, affirmed sub. nom. Otis & Co. v. Securities and Exchange Commission, 323 U. S. 624, 65 S.Ct. 483, 89 L.Ed. 511, where participation was accorded the various security holders in accordance with the standard of colloquial equity.

I do not consider the argument advanced as to what these series of preferreds would be worth if there were no Public Utility Holding Company Act. I do not think it profitable to consider an argument based on unreality *for there is a Public Utility Holding Company Act.* Unless one subscribes completely to the doctrine of foreordination, things might always be different from what they are.

Not only, therefore, is there no reason on the basis of fairness and equity why the preferreds should get their redemption feature, but also there are numerous and *satisfactory reasons, discussed above, why* the payment of the premium should be denied. In the cases of In re United Light & Power Co.; In re North Continent Utilities Corp.; In re Consolidated Electric & Gas Co., supra, and especially in Re Standard Gas & Electric Co., D.C.Del., 59 F. Supp. 274, refusal to pay the premium was upheld as being fair and equitable. I am not unmindful of the rule that there may be more than one fair and equitable plan; and because the premium payment was refused in one case does not necessarily mean that the payment of that premium in the particular case would have been held unfair; [6] but in view of all the factors which

---

[5] "The impact of the Otis decision was that the security device of preferred shareholders should not result in a windfall to preferred at the expense of common in a situation where Congress had prescribed that surgery be applied but with as little shock to investors as possible." 59 Har. L.Rev. 1159.

[6] But see In re Standard Gas & Electric Co., 3 Cir., 151 F.2d 326, 332, where the court indicated affirmatively that the premium should not be paid in these cases. It

have usually been considered in these cases, I conclude that because of the provision for payment of premium, the plan does not meet the requirements of fairness and equity.

■ With the exception of the payment of redemption premiums, the plan is approved including the Escrow Agreement. The arguments which contend that the Escrow Agreement is not fair to the preferred shareholders have been considered, but I think they have no merit.

A form of order may be submitted.

said: "All the debenture holders appearing before us insist that if the debentures are to be liquidated the holders are entitled to the call premiums specified in the contract between the company and the holders thereof. Neither the Commission nor the District Court agreed with this view and we do not either. There is good authority supporting the position that retirement of the obligation under these circumstances is not the kind of voluntary calling by the company which brings the terms into operation. * * *

"The debenture holders obliquely attack the holdings of these decisions and say in addition that they present a different problem from the one in this case. We think the decisions are right and that the reasons they give are applicable."